Barry Lee **FAIRCHILD**, Petitioner,

v.

A.L. **LOCKHART**, Director, Arkansas Department of Correction, Respondent.

No. PB–C–85–282.

United States District Court, E.D. Arkansas, Pine Bluff Division.

Sept. 11, 1987.

John Wesley Hall, Jr., Little Rock, Ark., for petitioner.

Jack Gillean, Office of Attorney General State of Ark., Little Rock, Ark., for respondent.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EISELE, Chief Judge.

Petitioner seeks habeas corpus relief following his conviction for the capital murder

and rape of Ms. Marjorie Mason on February 26, 1983. He was arrested on March 4, 1983, and on March 5, 1983, he was charged with such crimes by felony information in Lonoke County. Confessions were elicited during interrogation following petitioner's arrest purportedly on an unrelated Pulaski County charge of attempted murder of a police officer. The Lonoke County murder and rape information was later amended to add kidnapping and aggravated robbery as felonies underlying the capital murder charge. On August 2, 1983, a jury found petitioner guilty on the Lonoke County charges and sentenced him to death. In September 1983, petitioner pled guilty to charges of aggravated robbery in Pulaski County and was sentenced to twenty-five years imprisonment, said sentence to be concurrent with the sentence in the Lonoke County case.

Petitioner appealed his conviction and death sentence to the Arkansas Supreme Court, which affirmed both the judgment and the sentence. *Fairchild v. State*, 284 Ark. 289, 681 S.W.2d 380 (1984). The United States Supreme Court denied certiorari. *Fairchild v. Arkansas*, 471 U.S. 1111, 105 S.Ct. 2346, 85 L.Ed.2d 862 (1985). Petitioner sought and was denied post-conviction relief under Ark.R.Crim.P. 37.1. *Fairchild v. State*, 286 Ark. 191, 690 S.W.2d 355 (1985). Having conducted an evidentiary hearing on March 23 and 24, 1987, and having considered the briefs and argument of the parties, the Court now makes its factual findings and states its legal conclusions as follows.

## FINDINGS OF FACT

I. *The Oberle Investigation and Warrant.*

On December 28, 1982, Mr. D.S. Blound, a deputy prosecuting attorney, assigned to the Little Rock Police Department, signed an information charging petitioner Barry Fairchild with the crime of attempted capital felony murder allegedly occurring on or about December 23, 1982, "committed by unlawfully firing a weapon at Ofc. Joe Oberle, of the Little Rock Police Department, with the intent to kill, while Ofc.

Oberle was attempting to detain him." The witnesses listed on the information were Detective Sylvester and Officer Oberle of the Little Rock Police Department. Officer Mike Sylvester swore that the allegations contained in the information were the truth, the whole truth and nothing but the truth. His signature was subscribed and sworn to before Michele Boyd, Chief Clerk of the Criminal Division of the Municipal Court on December 28, 1982. On the basis of the information and the affidavit sworn to by Officer Sylvester, Ms. Boyd issued a warrant for the arrest of Barry Fairchild. No additional facts or information were presented to Ms. Boyd. The municipal judge had theretofore delegated to the Clerk's Office the power to issue warrants under Arkansas law. As Ms. Boyd testified, when the prosecuting attorney causes such an information to be filed as attested, the Clerk accepts same and automatically issues a warrant, making no independent determination of probable cause or of the factual basis for the filing of the charge. If the felony information is so filed, the Clerk's office presumes that it has been issued upon probable cause. Ms. Boyd testified that to her recollection the practice has been followed at least since the 1970s.

Officer Mike Sylvester has been with the Little Rock Police Department for some 15 years. In 1982 he was a detective in the Homicide Division. He investigated the assault on Officer Oberle. Officer Oberle, a patrol officer, had been assigned to investigate a robbery of an individual at the Circle "B" restaurant on Roosevelt Avenue. He talked to the victim, one Roy Roberts, about 3:30 a.m. on December 23, 1982. Mr. Roberts told him he had been robbed by two black males in their 20s. Officer Oberle found the vehicle in which the robbers had fled a short distance away. When he approached the car, two black males jumped out and he was fired upon. Officer Sylvester's investigation identified the vehicle, determined the owner and the possible identity of the driver. Officer Oberle reviewed a photo spread and identified Harold Green as one of the robbers. Officer

Sylvester was told by Officer Ivan Jones of the Little Rock Police Department that the latter had information from a confidential informant that petitioner Barry Fairchild was the other robber. Jones did not reveal to Sylvester the source of his information, but indicated that the source was generally reliable. Officer Oberle told Officer Sylvester that possibly three shots were fired, but he was not sure if they were fired by one or both of the robbers. The victim identified Mr. Green. Fairchild was not charged for the robbery itself.

The warrant obtained by Officer Sylvester was turned over for service to the appropriate office in the Little Rock Police Department. Several efforts were made to locate Barry Fairchild and to execute the arrest warrant on him, but to no avail. Some of these efforts were undertaken before the murder of Marjorie Mason.

Subjectively, Mr. Dale Adams, deputy prosecuting attorney, Ms. Michele Boyd, Chief Municipal Clerk, Detective Sylvester, Detective Ivan Jones, the officials who later processed the arrest warrant issued by Ms. Boyd, and all police officers who attempted to execute that warrant (arresting Barry Fairchild) acted in the good faith belief in the legality of what each was doing. No one recognized that there were any legal deficiencies in any of the procedures being followed.

The issuance of arrest warrants by the clerk, whenever informations were filed by the prosecuting attorney or his deputies, was essentially a ministerial act in the view of the clerk. The Clerk was under the directions of the Municipal Court to issue such warrants upon such occasions. No one had informed the clerk that any independent probable cause hearing or determination was required of the Clerk. If and when an information was filed, the instructions were to issue the arrest warrant for the defendant designated in the information.

## II. *The Arrest at Russellville.*

The petitioner, Barry Fairchild, knew the police were after him. He obtained a ride to Conway and then rode the bus to Russellville. The bus was stopped by police at Russellville but, for some unexplained reason, he was able to simply "walk away" from that scene. He then hid out in the woods in that area for several days. He would sleep during the daytime and roam around at night. On the night of March 3, 1983, at about 8:45 p.m., he went to the home of Mr. Pat Humphries who lived on North Detroit Street in Russellville. It was raining. Mr. Fairchild told Mr. Humphries, an elderly gentleman, that his car was broken down on the interstate which was only about a quarter-mile from the Humphries' residence. He stated that he needed a wrecker. As it turns out, Mr. Humphries' son and his son's girlfriend were in another room in the house. They had observed Mr. Fairchild approaching the house. They had heard on the radio about the search for Mr. Fairchild and the girl had apparently seen a photograph of Mr. Fairchild on the television. They "suspicioned" that Mr. Fairchild was in fact the person being sought by the police. The father called to his son to contact the wrecker service, but the son instead called the police and advised them not to come with their sirens on. Officer Ron Stobaugh was the first to arrive at the scene. He ran to the house and then tip-toed up on the porch and observed Mrs. Humphries looking through a telephone book and Mr. Humphries talking to a black man near the front door. Other officers were arriving by this time and going to both the front and the back of the house. Officer Stobaugh rushed into the house and grabbed Fairchild with his left hand and pulled him toward the front door. He had a gun in his right hand. Mr. Fairchild then started running out the front door where two more deputies grabbed at Mr. Fairchild. Mr. Fairchild was tripped, or simply stumbled, into the front yard, and Officer Stobaugh followed. The police had an attack dog near the front yard. The handler, believing Mr. Fairchild had an avenue of escape, directed the dog to attack Mr. Fairchild. The dog bit him on the scalp, and then firmly grabbed him on the side and held on. Mr. Fairchild was pushed over a car and handcuffed. The dog's handler then got

the dog to let go. The dog did not attack Mr. Fairchild after he was handcuffed but only before he had been secured.

Mr. Fairchild was then placed in Officer Larry Dalton's unit and taken to the emergency room at St. Mary's Hospital in Russellville. His head wound, a laceration about three inches long, was treated and bandaged. Mr. Fairchild was then taken to the Pope County Jail, where he was booked and fingerprinted. Some of the dogs were at the jail but none of them attacked or bothered Fairchild. Officer Dalton testified that a Pulaski County deputy sheriff (whom he did not recognize), Officer Reynolds, and he were in the office with Fairchild. Officer Reynolds is now deceased. Dalton testified that the unidentified Pulaski County deputy interrogated Fairchild at this time, and that when Fairchild did not answer, the Pulaski County deputy slapped Fairchild and screamed in his face. The Court has some difficulty with Officer Dalton's testimony and is not satisfied as to its accuracy. Officer Dalton was later fired from the Russellville Police Department and appeared to have some animus as a result. Furthermore, he did not come forward with such information until August of 1986. More important, when Mr. Fairchild testified at the *Denno* hearing in State Court he recounted much abuse but made no mention of any abuse occurring before his return to Little Rock.[1] Petitioner was not questioned about the Mason or Oberle cases at any time before his return to Little Rock.

Many Pulaski County officers had participated in the manhunt in and around Russellville for a couple of days. By the night of the arrest, Major Bowman of the Pulaski County Sheriff's office and perhaps a half-dozen other deputies from Pulaski County were still in Russellville.

When Mr. Fairchild arrived at the Pope County Jail, he was processed and his property inventoried. He was permitted to take a shower and was put in prison clothes. Officer Bowman and another officer drove Mr. Fairchild from Pope County back to the Pulaski Correctional Facility. Apparently they stopped along the way for gasoline for a period of 10–15 minutes. The distance from the Pope County Jail to the Pulaski County Correctional Facility is probably around 80–plus miles. Mr. Fairchild was not questioned by the officers during the trip back to Little Rock. From all the evidence, the Court gets the impression that, from the time he was actually secured during the arrest, Mr. Fairchild took a rather fatalistic, relaxed attitude.

III. *The Return to Little Rock.*

It appears that Mr. Fairchild and the officers left Russellville around 11:30 p.m. and arrived in Little Rock close to 1:30 a.m.

When Fairchild arrived at the Pulaski County Correctional Facility, he was turned over to Major Dill, and then possibly to Sheriff Robinson. Mr. Fairchild was read his rights and Officer Waggoner, Major Dill, and others talked with him. Mr. Fairchild talked freely about his involvement in the murder of Ms. Mason. Some notes were taken on Mr. Fairchild's admissions and then arrangements were made to videotape his statement or confession. There was a casual atmosphere. Coffee and doughnuts were brought in and consumed by the officers and Mr. Fairchild. The Court estimates that Mr. Fairchild was at the Pulaski County Correctional Facility for approximately an hour prior to the time of the commencement of the videotaped interview. A good part of that hour was taken up with Mr. Fairchild's explaining his role in the crime, but there were also periods when everyone just sat around waiting for the videotape arrangements to be made.

The force to which Fairchild was subjected at Russellville was necessary and incidental to the arrest. No force or threats or physical coercion were used against Mr. Fairchild on the trip back from Russellville to Little Rock, or at the Little Rock facility.

---

1. The Court notes in passing that the question asked of Fairchild, according to Dalton, concerned the whereabouts of the other suspect. Dalton further testified that Fairchild did not respond to the questions.

Fairchild's attitude was: "You got me!" He was willing to talk.

Officer Tom Waggoner was with Mr. Fairchild in the interview room. He had worked on the case and was also familiar with Fairchild. He secured the "rights" forms and advised Fairchild of his rights. Fairchild signed the forms and then freely discussed his involvement in the murder of Ms. Mason. When Mr. Fairchild agreed to give a videotaped interview, it was decided to move from the interview room into a larger office for that purpose.

None of the officers who were with Mr. Fairchild suggested to him what his testimony should be.

After the first videotaped statement was completed, Mr. Fairchild agreed to go with Major Dill, Sheriff Robinson and other officers on a "tour," starting at a point where Mr. Fairchild and his companion kidnapped Ms. Mason on Washington Street in North Little Rock and proceeding to the abandoned farm area near Scott. They then followed the route Mr. Fairchild and his companion traversed in leaving the area to the point where Fairchild's car ran off the road while being chased by an Arkansas State Police unit. Mr. Fairchild gave the directions which brought them all to the scene where Ms. Mason's body had earlier been found. He pointed out where they left the body. The Court did not, in the slightest, credit Mr. Fairchild's statements that the police officers were showing him the route taken and identifying for him the crime scene. At one point on the way back from the murder scene, Mr. Fairchild pointed out where he had thrown his gloves away. The officers stopped the cars and searched for the gloves but were unable to find them. During this "tour," the officers asked Fairchild about jewelry that they understood was taken from Ms. Mason's body. Mr. Fairchild told the officers that he had taken a watch from Ms. Mason but had sold it or given it away. When the officers asked who had it, he inquired if that person would get in trouble and was advised that such person would not get in trouble if he or she were not involved with the kidnapping or murder. Fairchild then told the officers that his sister had the watch. The officers then drove to Mr. Fairchild's house where they obtained the watch. They then returned to the Pulaski County Correctional Facility. Shortly thereafter, a deputy prosecuting attorney, Mr. Dale Adams, came to the facility and took another videotaped statement from Mr. Fairchild. A little later, officers from the Little Rock Police Department arrived and questioned Fairchild about his involvement in the assault on Officer Oberle.

## IV. *The Informant's Tips.*

Officer Ivan Jones has been with the Little Rock Police Department for 18 years. He was a detective in 1982. He provided certain information to Officer Fitzgerald about the armed robbery of Mr. Roberts and the attack on Officer Oberle on December 23, 1982. He obtained information from an informant whom he believed to be very reliable that Barry Fairchild was involved in the incident. He received that information on December 23, 1982, and passed it on to Officer Sylvester. The informant told Officer Jones what had happened, who was involved, and that he had gotten the information from someone else. Officer Jones did not press the informant for more details.

Officer Jones also received information from the same informant that Barry Fairchild was involved in the Mason murder. He received this information a couple of days after the murder. The informant told Officer Jones that he had heard some conversations to that effect out at Granite Mountain. He named the two people involved as Barry Fairchild and Fairchild's brother, Robert. The informant told Officer Jones that Robert had told him (the informant) that he (Robert) and Barry Fairchild raped the girl and then Barry shot her and that they left the girl, drove off, were chased, and then got out of the car and ran. Officer Jones testified that this confidential informant was used by him over a period of years and that he kept Jones informed of things going on in and around the Granite Mountain area. The information given was, in Jones' opinion, extremely reliable and was responsible for enabling Jones to

make several cases. Although the informant was known to embellish his stories, Officer Jones testified that he never found that informant to be wrong. However, the Pulaski County Sheriff's file on the Mason case does reveal that Jones acknowledged that "about 50% of the time information is not correct or greatly enhances his information to make it look like he knows more than he actually does"—a characterization that might be read as suggesting that the informant's unreliability extended beyond mere embellishment. Officer Jones personally made several attempts to arrest Barry Fairchild on the Oberle assault case. He went to an apartment where Fairchild was supposed to be three different times and searched for him, but to no avail. These efforts to arrest Fairchild were made before the murder of Ms. Mason.

## V. *Representation at Trial.*

Mr. Joe O'Brien, an attorney, represented Mr. Fairchild in the Mason murder case. Ms. Marjorie Kessel was appointed to assist him. They did not represent Mr. Fairchild in connection with the Oberle assault case. Mr. Fairchild had another attorney, Howard Koopman, representing him with respect to that Pulaski County charge. Mr. O'Brien, though young, has had considerable experience in the defense of criminal cases.

The Court first observes that an overall review of the record indicates that Mr. O'Brien generally provided Mr. Fairchild with excellent legal representation. He is charged here with ineffectiveness in failing to challenge Mr. Fairchild's arrest in the Pulaski County case (the Oberle assault case). In this connection it should be noted that Mr. O'Brien did move to suppress the videotaped confession on the theory that Fairchild's arrest was illegal and that the confessions were obtained as a direct result of said illegal arrest. It will be recalled that Mr. Fairchild was, ostensibly at least, arrested on the Pulaski County charge. This arrest occurred before he was actually charged with Ms. Mason's kidnapping and murder. It was Mr. O'Brien's theory that the arrest on the Pulaski County charge was pretextual. Mr. O'Brien and Ms. Kessel did not directly attack the arrest of Mr. Fairchild on the Pulaski County charge as a predicate for seeking suppression of his confessions.

Mr. O'Brien did determine that a warrant had been issued on the Pulaski County charge after an information had been signed and filed by the prosecuting attorney, coupled with the "affidavit" of Officer Sylvester. He believed that procedure to be sanctioned by Arkansas law and long practice. As suggested in the "Conclusions of Law" section, petitioner's attorneys were reasonable in relying in good faith upon the validity of the Arkansas law permitting the arrest warrants to be issued without an independent probable cause determination.

It cannot be said, however, that they were reasonable in failing to note that the affidavit requirement of that law was violated in this case. Counsel's oversight may perhaps be explained by the fact that the applicable statute, Ark.Stat.Ann. § 22–751, fails to recite an affidavit requirement and adjoins a statutory section which sets forth an *alternative* procedure for obtaining an arrest warrant solely on the strength of an approved affidavit. Ark.Stat.Ann. § 22–752. Although this Court reads an affidavit requirement into section 22–751, see "Conclusion of Law," *infra,* petitioner's attorneys' apparent confusion in the face of the legislation is understandable. In any event, the Court finds that counsel's failure to assert this deficiency would not have affected the result because petitioner's arrest was lawful, there existing at the time probable cause to arrest him for the murder and rape of Ms. Mason. The facts, which were known and determined by the police before petitioner was arrested in Russellville, are, for convenience, detailed in the discussion of this issue under "Conclusions of Law" below.

## CONCLUSIONS OF LAW

Petitioner alleges both that his counsel was ineffective in failing to challenge the basis for the arrest in the Pulaski County case as a predicate for challenging the con-

fessions and that the confessions were coerced from him. The Court will consider these two allegations in turn. Most of the factual issues have been disposed by the Court's "Findings of Fact" set forth above. However, some additional factual findings will be made during the Court's discussions of the legal issues, *infra*.

## I. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner maintains that he was denied effective assistance of counsel under the Sixth and Fourteenth Amendments because his counsel in the Lonoke County action failed to challenge his arrest pursuant to the Pulaski County warrant. He contends that his counsel could have successfully challenged the warrant by arguing, first, that the procedure for issuing the warrant was unconstitutional; secondly, that the warrant was issued without probable cause; thirdly, that police lacked probable cause to effect a warrantless arrest; and finally, that police relied on the Pulaski County warrant as a pretext to arrest him for questioning concerning the murder for which he was ultimately convicted in Lonoke County. He contends that the taint of the allegedly illegal arrest would have compelled the trial court to suppress the three confessions used against him at trial.

■ Before considering the merit of petitioner's claims, this Court must determine whether his objections can appropriately be raised by his habeas corpus petition. As a general principle, a procedural default in state court will bar habeas corpus relief unless the petitioner can show cause for and prejudice resulting from the failure to raise the claim in state court. *Engle v. Isaac*, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508–2509, 53 L.Ed.2d 594 (1977). The question of what constitutes "cause" has generated considerable controversy in the courts. *See* Note, "Stone v. Powell and the Effective Assistance of Counsel," 80 Mich.L.Rev. 1326, 1327 n. 9 (1982) (citing cases). Any confusion on this score was resolved, however, by *Kimmelman v. Mor-*

*rison*, 477 U.S. 365, 106 S.Ct. 2574, 2582, 91 L.Ed.2d 305 (1986), in which the Supreme Court held that the established restriction on federal habeas review of Fourth Amendment claims, *Stone v. Powell*, 428 U.S. 465, 493, 96 S.Ct. 3037, 3051, 49 L.Ed.2d 1067 (1976), does not extend to Sixth Amendment claims alleging attorney incompetence in failing to pursue the Fourth Amendment claims in state court. The Court observed:

In order to prevail, the defendant must show both that counsel's representation fell below an objective standard of reasonableness, *Strickland* [*v. Washington*] 466 U.S. [668], at 688, 104 S.Ct. [2052], at 2065 [80 L.Ed.2d 674 (1984)], and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct., at 2068. Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice. Thus, while respondent's defaulted Fourth Amendment claim is one element of proof of his Sixth Amendment claim, the two claims have separate identities and reflect different constitutional values.

The ironic conclusion is that this Court will need to consider the merits of petitioner's claim in order to determine whether the claim can be properly presented here. As the analysis below will reflect, the Court is of the opinion that petitioner would have—at least ultimately—succeeded in challenging the Pulaski County warrant in state court. In order to determine whether counsel's failure to raise this challenge resulted in any prejudice to petitioner, the Court must determine, first, whether the confessions resulting from the arrest might be deemed admissible pursuant to the good-faith exception to the exclusionary rule and, secondly, whether the police

had any basis other than the warrant for effecting the arrest. The Court is persuaded that there was indeed an independent basis for arresting petitioner—namely, the existence of probable cause to arrest him for the Mason murder itself. In light of the Court's further conviction that the confessions were voluntarily made, it follows that respondent's petition must be denied under the standard set forth in *Kimmelman.* The discussion below will set forth not only the grounds for denying petitioner's petition, but also the grounds for rejecting various arguments offered by the state in support of its conduct. While consideration of the latter issues is not essential to the Court's holding, there are two compelling reasons for discussing them below. First, in a case involving the death penalty it is critical that a reviewing court scrupulously explain its reasoning on all issues of potential importance. Secondly, if a reviewing court were to disagree with this Court's disposition of the case, it would then have the benefit of an analysis of Arkansas statutory and case law in the very important area regarding the constitutionality of state procedures for issuing arrest warrants.

## A. THE PULASKI COUNTY ARREST WARRANT

### 1. *The procedure for issuing the warrant.*

█ It has long been established that under the Fourth Amendment a warrant can be validly issued only by a "neutral and detached magistrate." *Giordenello v. United States,* 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). In *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), the Supreme Court held that "an issuing magistrate must meet two tests. He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search." The Court concluded in *Shadwick* that a court clerk was competent to make probable cause determinations in simple municipal ordinance cases. The Court further declared that a clerk met the requirement of

neutrality and detachment, since he or she "is removed from prosecutor or police and works within the judicial branch subject to the supervision of the municipal court judge." *Id.* at 351, 92 S.Ct. at 2123.

In the present case the warrant was technically issued by the clerk of the Court. However, the testimony revealed that the clerk made no determination other than that an affidavit and information existed. The clerk testified that she understood it to be her duty to issue a warrant if the prosecutor presented her with such documents. She was not to make any independent probable-cause determination. The constitutional difficulties attending such a procedure are evident when one considers the U.S. Supreme Court's review of its previous holdings in *Gerstein v. Pugh,* 420 U.S. 103, 117–18, 95 S.Ct. 854, 864–65, 43 L.Ed.2d 54 (1975):

> Although a conscientious decision that the evidence warrants prosecution affords a measure of protection against unfounded detention, we do not think prosecutorial judgment standing alone meets the requirements of the Fourth Amendment.... [I]n *Coolidge v. New Hampshire,* 403 U.S. 443, 449–453, 91 S.Ct. 2022, 2029–2031, 29 L.Ed.2d 564 (1971), the Court held that a prosecutor's responsibility to law enforcement is inconsistent with the constitutional role of a neutral and detached magistrate. We reaffirmed that principle in *Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972), and held that probable cause for the issuance of an arrest warrant must be determined by someone independent of police and prosecution.

(Footnote omitted.) The Court in *Gerstein* distinguished the situation in which a warrant automatically issued on the basis of a grand jury indictment, noting that "the grand jury's relationship to the courts and its historical role of protecting individuals from unjust prosecution" served to insulate such a warrant-issuing procedure from constitutional attack. *Id.* at 117 n. 19, 95 S.Ct. at 865 n. 19.

It follows from the above that an arrest warrant rubber-stamped by a clerk of the Court at the prosecutor's behest cannot meet the test of constitutionality. As the Supreme Court noted in *Coolidge:*

> [T]he whole point of the basic rule ... is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations—the "competitive enterprise" that must rightly engage their single-minded attention.

(Footnote omitted.) 403 U.S. at 450, 91 S.Ct. at 2029. Given the Supreme Court's reluctance to countenance conduct by a magistrate even resembling that of "an adjunct law enforcement officer," *Lo–Ji Sales Inc. v. New York,* 442 U.S. 319, 326–27, 99 S.Ct. 2319, 2325, 60 L.Ed.2d 920 (1969), the Court sees no basis for presuming the impartiality of a *de facto* magistrate who actually *was* a law enforcement officer. It is now beyond dispute that a warrant may issue only upon the determination of a neutral and detached magistrate, and the Supreme Court in *Coolidge* and *Shadwick* stated the equivalent of a conclusive presumption that a prosecutor cannot exhibit such qualities.

### 2. *The Sylvester affidavit and the issue of probable cause.*

■ The Fourth Amendment expressly provides that "no warrants shall issue, but upon probable cause, *supported by oath or affirmation....*" (Emphasis added.) In *Gerstein,* the Court made clear that the prosecutor's oath of office would not fulfill the constitutional requirement that probable cause for issuance of a warrant be determined on the basis of sworn information:

> In *Albrecht v. United States,* 273 U.S. 1, 5, 47 S.Ct. 250, 251, 71 L.Ed. 505 (1927), the Court held that an arrest warrant issued solely upon a United States Attorney's information was invalid because the accompanying affidavits were defective. Although the Court's opinion did not explicitly state that the prosecutor's official oath could not furnish probable cause, that judgment was implicit in the

judgment that the arrest was illegal under the Fourth Amendment.

420 U.S. at 117, 95 S.Ct. at 864.

The only oath or affirmation that might support a finding of probable cause, then, is contained in the affidavit of Officer Sylvester. The information which served as a basis for issuance of the warrant in the Oberle case provides:

> The Prosecuting Attorney of The Sixth Judicial District, in the name and by the authority of the State of Arkansas, accuses defendant(s) with the crime of violating Ark.Stat.Ann. s 41–701 (Attemp. Cap Fel Murder) on or about the 23nd [sic] day of December, 1982, committed by unlawfully firing a weapon at Ofc. Joe Oberle, a Little Rock Police Officer, with the intent to kill, while Ofc. Oberle was attempting to detain him.

On the reverse of this information, Officer Mike Sylvester swore to the truth of the allegations contained in the document. The area immediately above Officer Sylvester's signature, which contains a number of lines, is blank.

In *United States v. Ventresca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed. 2d 684 (1965), the Supreme Court set forth the standard for determining the adequacy of a warrant:

> This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the "underlying circumstances" upon which that belief is based.... Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the court should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit

demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

(Citation omitted.) Given the factual background set forth above, the Court does not feel that this case can be characterized as "doubtful or marginal" with respect to the adequacy of the affidavit. The affidavit recites none of the underlying circumstances supporting Officer Sylvester's conviction that the petitioner was involved in the Oberle assault, no information regarding the identity or reliability of informants, and no corroborating circumstances in support of any informant's tips. Nothing. The Court must consequently conclude that the affidavit failed to establish probable cause, that the prosecutor indeed "signed off" as a rubber-stamp for the police, and that the clerk thereafter "signed off" as a rubber-stamp for both the police and the prosecutor. In sum, the warrant-issuing authority failed to meet the requirements of detachment and neutrality both because of his position as prosecutor and because of his readiness to order issuance of the warrant without an adequate basis in sworn declarations.

3. *Applicability of the good-faith exception.*

■ In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Supreme Court held that "the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." Under this formulation, the good-faith exception would appear to be unavailable to the prosecution in this case, since the prosecutor who in effect issued the warrant cannot be considered detached and neutral. This conclusion appears consistent with the principle that law-enforcement officials are forbidden to plead ignorance of breaches committed by other law-enforcement officials as a basis for invok-

ing the good-faith exception to the exclusionary rule. *See, e.g., Whiteley v. Warden,* 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971) (officer obtaining warrant based on "bare-bones" affidavit cannot rely on good faith of officers executing the warrant to insulate arrest from attack).

In *Leon,* the Court suggested that the primary purpose of the exclusionary rule is "to deter police misconduct." *Id.* It elaborated by echoing a comment it had made twice before:

" 'The deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official conduct was pursued in complete good faith, however, the deterrence rationale loses much of its force.' "

*Id.* 104 S.Ct. at 3419, *quoting United States v. Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 2318, 45 L.Ed.2d 374 (1975), *quoting Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974). The Court in *Leon* went on to quote further from *Peltier:*

"If the purpose of the exclusionary rule is to deter unlawful police conduct, then evidence obtained from a search should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search [or arrest] was unconstitutional under the Fourth Amendment."

*Id.* 104 S.Ct. at 3419–20, *quoting Peltier,* 422 U.S. at 542, 95 S.Ct. at 232.

In the present case, the determination of whether law enforcement officials met the test set forth in *Leon* involves a two-part inquiry. First, the Court must determine whether the observance by the executive branch of what will be established as an unconstitutional, but legislatively and judi-

cially endorsed, procedure for issuing warrants would trigger the good-faith exception under the facts of this case. The ensuing analysis should establish that the exception would apply under such circumstances. Secondly, it must be determined whether the prosecutor's reliance on a facially invalid affidavit in support of the arrest warrant serves to foreclose reliance on the good-faith exception. The Court will conclude that it does, and that the use of the confessions cannot be justified by reliance on the exception.

The question whether a law enforcement officer can or should be charged with knowledge of a Fourth Amendment violation when the violation arose from the law enforcement officer's observance of a statutory scheme was very recently addressed in *Illinois v. Krull,* —— U.S. ——, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987). In *Krull,* the Supreme Court held that the exclusionary rule did not apply to evidence obtained by police who conducted a warrantless administrative search in objectively reasonable reliance on a statute which was subsequently found to violate the Fourth Amendment. The Court explained its holding in the following terms:

> The approach used in *Leon* is equally applicable to the present case. The application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have as little deterrent effect on the officer's actions as would the exclusion of evidence when an officer acts in objectively reasonable reliance on a warrant. Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written. To paraphrase the Court's comment in *Leon:* "Penalizing the officer for the [legislature's] error, rather than his own, cannot logically contribute to the deterrence of

Fourth Amendment violations." 468 U.S., at 921, 104 S.Ct. at 3420.

107 S.Ct. at 1167. (Footnote omitted.) The Court further observed that "[a] statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws." *Id.* at 1170.

*Krull* is distinguishable from the present case in that the legislature there had unconstitutionally dispensed altogether with the warrant requirement in the context of administrative searches, whereas here the legislature empowered an executive—or, at best, "quasi-judicial"—official to obtain arrest warrants in a manner that was (as will be established below) constitutionally deficient. This distinction, while significant, is not sufficient to render *Krull* inapplicable in this instance. The issue here, as in *Krull,* is quite simply whether the legislature totally abandoned its responsibility to enact constitutional laws when it passed legislation that resulted in an unconstitutional seizure.

■ A review of the history leading to the present practice has persuaded the Court that no "abandonment" of legislative responsibility occurred and that the good-faith exception accordingly constitutes an available defense. In 1937, Arkansas adopted Amendment No. 21 to its Constitution, which provides in pertinent part:

> *Sec. 1. Prosecution by indictment or information.* All offenses heretofore required to be prosecuted by indictment may be prosecuted either by indictment by a grand jury or information filed by the Prosecuting Attorney.

Prior to the adoption of this amendment, an executive officer obtained a warrant simply by presenting the indictment to the court clerk, who then issued the warrant as a matter of course. The constitutional appropriateness of this procedure was reaffirmed by the Supreme Court in *Leon.* 420 U.S. at 117 n. 19, 95 S.Ct. at 865 n. 19. In 1937, before the development of an elaborate body of case law clarifying Fourth Amendment protections, the authorities apparently simply adopted without constitu-

tional inquiry the same practice for issuing warrants based on informations as on indictments.

Curiously, the constitutional modification adopted in 1937 was anticipated by legislation enacted much earlier. Ark.Stat.Ann. § 43–409 provides:

*43–409. Issuance of warrant on information of prosecuting attorney.*—The prosecuting attorney of every circuit in this State, shall have authority, whenever he believes any person has committed a crime in any county in the circuit for which he is elected, to file, before any justice of the peace within the county in which he believes such crime has been committed, any [a] written information, under oath, charging such person in due form of law with the commission of such crime, whereupon the justice shall issue his warrant for the arrest of the offender, and have him brought before him, to be dealt with according to law. [Act Mar. 1, 1883, No. 49, s2, p. 72; C & M Dig., s8320; Pope's Dig., s10897.]

Although enacted in 1883, this legislation was ineffective until 1937, when Amendment 21 first allowed for the use of informations as an alternative to indictments. *See* Comment, "Legislation—No. 121—Issuance of Warrants of Arrest by the Clerks of the Municipal Courts," 15 Ark.L.Rev. 433, 435 (1961). Perhaps the most striking feature of § 43–409 is that, although it prescribes a procedure for the issuance of warrants that includes the presentation of the information to a neutral and detached magistrate, it appears to *require* the magistrate to issue the warrant upon such presentation. If this reading is correct, the statute would impermissibly vest power to make probable-cause determinations in the hands of the prosecutor.

In 1961, the Legislature enacted a series of statutory provisions creating a new alternative for the issuance of warrants, i.e., by clerks—a procedural avenue that had apparently been well travelled on an informal basis before the enactment:

*22–751. Clerk empowered to issue warrant of arrest.*—The clerks of the municipal courts of the state of Arkansas may, when empowered by the judge of the municipal court, issue a warrant of arrest upon the filing with such clerks of information by the prosecuting attorney, or an information or complaint by the city attorney. [Acts 1961, No. 121, sl, p. 276.]

*22–752. Warrant issued upon filing of affidavit.*—The clerks of the municipal courts of the state of Arkansas shall issue a warrant of arrest upon the filing with such clerk of an affidavit for warrant of arrest, signed by any individual provided such affidavit has been processed by the prosecuting attorney or city attorney or the prosecuting attorney or city attorney has marked thereon approval of issuance of the warrant. [Acts 1961, No. 121, s3, p. 276.]

*22–753. Clerk not authorized to issue search warrant.*—The methods provided herein for issuance of warrants of arrest shall be in addition to those now provided by law, but shall not authorize a clerk to issue a search warrant. [Acts 1961, No. 121, s3, p. 276.]

The emergency clause appended to this legislation reads as follows:

Section 4 of Acts 1961, No. 121 read: "Whereas, there is conflict as to whether municipal court clerks have the authority to issue warrants, and many judges have the duty of issuing warrants, and to do so they must in advance listen to the testimony and statements of complainants, in order to prepare a proper affidavit and warrant, which process is detrimental to fair, impartial, and unprejudicial justice, and such complaints should be made to the prosecuting attorney or city attorney, it is found that this Act is in the furtherance of the administration of justice, and is necessary for the immediate preservation of the public peace, welfare, and safety, and an emergency is hereby declared and this Act shall be in force and effect from and after its passage." Approved February 22, 1961.[2]

---

2. A law review commentator paraphrased this emergency clause as follows:

The reasons for Act 121 as stated in section 4 are: (1) to eliminate the possibility of con-

Several aspects of this legislation and the emergency clause invite commentary here, since they bear directly on the issue of legislative intent. To begin with, although the statutory provisions clearly comprise a unit, they appear to create two new alternatives for the issuance of arrest warrants. It is noteworthy that § 22–751 provides that a clerk "may" issue an arrest warrant when empowered by the judge. By contrast, § 22–752 directs that a clerk "shall" issue an arrest warrant when presented with an affidavit approved by the prosecutor, apparently regardless of whether such issuance has been previously condoned by the Court. Finally, § 22–753 stresses that the previous two statutes are an expansion of other statutory procedures (which still would always require the intercession of a magistrate) only with respect to arrest warrants. The language of § 22–751 reflects a legislative intention to allow magistrates, if they wish, either to issue warrants themselves or to assign the arrest warrant-issuing power either completely or in part to municipal clerks (hence the "may" in § 22–751). The "shall" of § 22–752 further reflects an intention that prosecutors be able to avoid an independent review by a magistrate altogether simply by presenting the clerk with an approved affidavit. This reading of the statute is thoroughly consistent with the suggestion in the emergency clause that the practice of allowing clerks to issue warrants would in fact serve the ends of "impartial" justice.

Against this background, it is apparent that the language "when empowered by the judge of the municipal court" in § 22–751 cannot be read as conditioning the issuance of a warrant by a clerk on an actual probable-cause determination by the judge in each case. It rather indicates that the Court has the discretion to make a procedural decision (on a case-by-case basis or by a general rule or order) locating the ministerial aspect of the warrant-issuing function either partly or completely in the clerk and the discretionary aspect of the function—i.e., the determination of probable cause—either partly or completely in the prosecutor. Section 22–752 confirms that the Legislature intended such an impermissible transfer of the probable cause determination, since it unambiguously declares that the prosecuting attorney may deny the municipal judge even the option of making the probable cause determination simply by presenting the clerk with an approved affidavit and demanding a warrant.

It thus emerges from this statutory interpretation that the potentially ambiguous language of § 22–751 is unambiguous if read in conjunction with § 22–752 and the emergency clause appended to all three provisions of the statute. The Court feels that this point is worth stressing because the Arkansas Supreme Court has on one occasion offered a different reading of the similarly ambiguous language of Arkansas Rule of Criminal Procedure 7.1(c), which provides:

> The clerk of a court or his deputy may, *when authorized by the judge of that court,* issue an arrest warrant upon the filing of an information or upon affidavit sworn to by the complainant and approved by the prosecuting attorney. Any such information or affidavit shall be indorsed by the prosecuting attorney approving the issuance of the warrant.

(Emphasis added.) It should be noted that this Rule embodies parts of both § 22–751 and § 22–752, although it modifies the latter section in that it requires prior Court authorization of the procedure for issuing warrants based only upon an approved affidavit. In *Webb v. State,* 269 Ark. 415, 419, 601 S.W.2d 848 (1980), the Supreme Court interpreted the underscored passage to mean that only a judicial officer is empowered to issue warrants, and that a warrant issued by the municipal court clerk simply upon the filing of an information must be considered defective. Unaccountably, the Court failed even to refer to §§ 22–751 and

flict between unprejudicial justice and a preformed opinion by the municipal judge as a result of listening to complaints [to determine reasonable grounds for the issuance of the warrant], and (2) to relieve the judge of te-

dious detail work. Although not formally stated, a third reason which has been given is that they have been doing it for years. Comment, 15 Ark.L.Rev. at 434 (bracketed material in original).

752, which would appear to condone the procedure challenged in *Webb*. It is difficult to determine just what the Court intended to establish in *Webb*, but it is clear that the statutes will not support the reading suggested for Rule 7.1(c). The ensuing analysis should further establish that Rule 7.1(c) can be squared with constitutional imperatives only if interpreted as suggested in *Webb*.

The law-review commentator on the first two sections of the statute, in discussing the potential constitutional problems generated by their passage, hinted that the legislation drew support from the Arkansas Supreme Court's pronouncements in *Penton v. State*, 194 Ark. 503, 109 S.W.2d 131 (1937), which held that there is no due process violation in allowing a prosecutor to file an information without prior review by a magistrate. The commentator also cited a line of very old cases from other jurisdictions holding that "a preliminary finding of probable cause for arrest is a 'quasi-judicial' act, and as such is not restricted to judicial officers." 15 Ark.L. Rev. at 435. The commentator's closing paragraphs are so pertinent to the Court's inquiry that they are worth reproducing in full:

> ARK. CONST. art. II, s15 (1874) seemingly would apply to warrants of arrest. It provides that "the right of the people ... to be secure in their persons, ... against unreasonable ... seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, particularly describing ... the person ... to be seized." Even though both warrants of arrest and search warrants are included in the same constitutional provision there seems to be a double standard in the determination of "probable cause" as a requirement for issuance. In *Ex parte Levy*, 204 Ark. [657] 857, 163 S.W.2d 529 (1942), it was held that a warrant of search and seizure was a judicial writ to be issued only by a judicial officer, and only upon the conditions and circumstances stated in the Constitution. Being a judicial act, neither a clerk nor any other ministerial officer had jurisdiction

to issue such a warrant. *Ex parte Levy, supra,* was cited as support for the holding in *State v. Davey,* 47 Del. 221, 89 A.2d 871 (1952), which was to the effect that the issuance of a search warrant was a judicial function, and that a statute, REV.CODE 1935–DD, as added by 48 DEL.LAWS c. 303, purporting to delegate authority to issue such a warrant to a clerk of the Court of Common Pleas was unconstitutional. These constitutional aspects under ARK. CONST. art. II s15 (1874) were neither raised nor adjudicated in the *Penton* case, *supra,* when the constitutionally [sic] under the federal constitution of ARK. CONST. amend. No. 21 (1874) was determined.

> Act 121 might be challenged on the grounds that judicial determination of probable cause for issuance of a warrant is bypassed and that a ministerial officer cannot perform a judicial act. The language of the Arkansas Constitution which requires the presence of probable cause as a basis for issuing a warrant seems to indicate that the protection afforded the rights and interests of individual citizens is the same regardless whether the warrant is one of arrest or of search and seizure. On the other hand in the *Penton* case, *supra,* the court held the filing of an information and subsequent conviction based thereon valid without the determination of probable cause by a judicial officer. Other jurisdictions have held that the determination of probable cause for arrest is a quasi-judicial act, and that where a determination of probable cause for issuance of a search warrant is required a clerk cannot validly determine it. If the validity of Act 121 is ever challenged, these conflicts will have to be resolved by the Arkansas Court.

*Id.*

As is suggested by the commentator's references to case law designating the issuance of arrest warrants as a "quasi-judicial" act, the lesser procedural protection afforded arrest warrants is by no means unique to Arkansas. Some observers have remarked that this apparently lesser con-

cern for arrest warrants is also revealed in the fact that they are generally required in a narrower range of circumstances. La-Fave notes, without presuming to adequately explain, that "arrest warrants appear to be of lesser importance in the constitutional scheme, given the fact that arrests may constitutionally be made without a warrant notwithstanding the more than ample opportunity to obtain one." 2 Search and Seizure: A Treatise on the Fourth Amendment § 4.2, at 35 (1978). In a footnote to this observation, he notes that an exception to this general rule exists when an entry of a suspect's premises is required to effect the arrest. *Id.* at 35 n. 31. *See Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1979).

In order to determine whether arrest warrants are indeed of lesser constitutional significance—and, by extension, whether the statutory distinctions between the two in Arkansas are in any way justifiable—it is necessary to distinguish between the standards for determining *when* and *how* an arrest warrant must issue. LaFave's comments fail to focus on this distinction, and they further fail to reflect that the distinctions with respect to when either variety of warrant is required may be explained as designed to avoid compromising a suspect's reasonable expectation of privacy. Hence, in explaining its conclusion that an arrest warrant must be obtained prior to effecting a home arrest, the Supreme Court in *Payton* observed:

> As the Court reiterated just a few years ago, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313 [92 S.Ct. 2125, 2134, 32 L.Ed.2d 752]. And we have long adhered to the view that the warrant procedure minimizes the danger of needless intrusions of that sort.

445 U.S. at 585–86, 100 S.Ct. at 1379–80.

When considered in terms of the suspect's privacy interest, it appears that the accepted rule as to when an arrest warrant must issue does not, after all, exalt a suspect's interest in being free of unreasonable searches and seizures of his property above his interest in being spared unreasonable restraints on his personal liberty. In accordance with Justice Powell's observation in *United States v. Watson,* 423 U.S. 411, 428, 96 S.Ct. 820, 830, 46 L.Ed.2d 598 (1976) (concurring), that the arrest of a person is "quintessentially a seizure," *Payton* established that when a suspect's privacy interest is implicated, a seizure of the person is subject to the same restraints as a seizure of property. Just as one may arrest a suspect in a public place without prior judicial approval, assuming the existence of probable cause, *Watson,* 423 U.S. at 417, 96 S.Ct. at 824, so one may seize an item held out to the public without first obtaining a warrant from a detached and neutral magistrate, *see, e.g., Cardwell v. Lewis,* 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed. 2d 325 (1974) (because no reasonable expectation of privacy in paint on outside of car, warrantless seizure of paint sample from car not violative of Fourth Amendment). There is, in short, what might be termed an "equal dignities" rule, founded on the expectation of privacy, which controls when either an arrest or a search warrant must issue.

The question already resolved in Section I.A.1 of these Conclusions of Law is whether the Constitution requires that there likewise be an equal dignities rule with respect to *how* each variety of warrant is issued—i.e., whether both search and arrest warrants must invariably be issued by a neutral and detached magistrate. In *Shadwick,* the Court stated the principle governing the qualifications constitutionally required of magistrates in the broadest of terms: any such official, regardless of what variety of warrant he is issuing, must be neutral and detached and capable of making a probable cause determination. 407 U.S. at 350, 92 S.Ct. at 2122. The appropriateness of this requirement may well arise in part from the uncertainty at the time the warrant is issued as to whether an arrest will be effected in a way that implicates a suspect's reasonable expectation of privacy—i.e., whether the authorities will eventually locate and apprehend the suspect at home or elsewhere. In any

event, both this Court and the state of Arkansas are bound by the Supreme Court's unequivocal declaration in *Shadwick*. The lesser dignity Arkansas accords arrest warrants must be considered constitutionally impermissible.

The immediate issue in this section of the Court's opinion is whether the Legislature's enactment of this unconstitutional procedure reflects a dereliction of duty sufficient to constitute a total abandonment of responsibility, thereby foreclosing application of the good-faith exception pursuant to *Krull*. While recognizing this issue as a close one, the Court is persuaded that the Legislature's breach in this instance was not egregious enough to preclude possible application of the exception. Admittedly, *Coolidge* and *Shadwick* represent clear statements by the Supreme Court that issuance of a warrant requires the intercession of a detached and neutral magistrate. Moreover, at least one other jurisdiction has realized and declared the unconstitutionality of a rule identical to that contained in the legislation here at issue. *In re Green,* 593 S.W.2d 518 (Mo.1979); *In re Harris,* 593 S.W.2d 517 (Mo.1979) (rule which says clerk obliged to issue arrest warrant upon prosecutor's complaint unconstitutional). The Court is struck, however, by the stringency of the *Krull* test: what is required to foreclose access to the good-faith exception is that the Legislature have wholly abandoned its duties to enact constitutional legislation. *Coolidge* and *Shadwick* were announced well after the suspect legislation was enacted, and the very fact that the Supreme Court granted certiorari in these cases suggests the uncertainty with respect to probable cause determinations in the past. Moreover, the Supreme Court's pronouncements on the

detached and neutral magistrate requirement have been made almost exclusively within the context of challenges to search warrants—a fact which may reflect the general impression, remarked upon by LaFave, that arrest warrants were to be considered of lesser constitutional significance.

When one considers, as a totality, the penetrating criticism of this legislation by the commentator referenced above, the action of the Supreme Court of Missouri in declaring similar legislation unconstitutional, and the general tenor of recent Supreme Court decisions addressing the neutral and detached magistrate requirement, it might well appear that a diligent legislature would have repealed the legislation at some point after its adoption. There is nothing in *Krull*, however, that forecloses application of the good-faith exception in those cases where the unconstitutionality of legislation becomes apparent only after its adoption. Moreover, the Legislature's failure to act is mitigated by the fact that the Supreme Court of Arkansas has been highly ambiguous in its approach to the legislation. Rule 7.1(c) was adopted by the Supreme Court in response to the enactment of §§ 22–751 through 753, and presumably with full awareness of the legislative intention reflected in the statutory language and the emergency clause. It follows that at least until 1980, when *Webb* was announced, the Supreme Court might reasonably have been seen as having sanctioned the procedure set forth in the legislation. Moreover, while both the holding of and the interpretation of Rule 7.1(c) set forth in *Webb* are inconsistent with the statutes, it is noteworthy that the Supreme Court in *Webb* never even hinted at the unconstitutionality of the legislation.[3] Indeed, on one

---

3. The Supreme Court was again faced with, and avoided, the opportunity to address the subject legislation in *Stewart v. State,* 289 Ark. 272, 711 S.W.2d 787 (1986). In *Stewart,* the Court rejected the suggestion that the good-faith exception might support admission of a defendant's confession following his arrest pursuant to a St. Francis County warrant which had been signed in blank by a municipal judge and completed by the clerk in a police officer's presence. The Court noted that the procedure used violated Criminal Procedure Rule 7.1(b), which calls for

the issuance of a warrant by a "judicial officer" when "it appears there is reasonable cause to believe an offense has been committed and the person committed it." *Id.* at 274, 711 S.W.2d 787. At no point did the Court consider that a magistrate's practice of signing warrants in blank might be tantamount to a judicial authorization for the clerk to issue warrants—a practice expressly approved in Rule 7.1(c) and in Ark.Stat.Ann. §§ 22–751 and 22–752. It would appear that the unconstitutionality of transferring the power to make probable cause determi-

occasion when the Arkansas Supreme Court was directly confronted with a due-process challenge to the identical practice for issuing warrants in circuit court, the Court dismissed the argument without so much as a reference to Fourth Amendment issues: in *Beckwith v. State*, 238 Ark. 196, 199, 379 S.W.2d 19 (1964), the Court intimated that it might well be appropriate for a circuit court clerk automatically to issue an arrest warrant on the strength of a prosecutor's information. In light of such seeming judicial approval of the challenged practices, the Legislature's failure to conduct the sort of review called for by the commentator cited above seems less than egregious.

The Court is further persuaded that the overriding purpose of the exclusionary rule —to deter police misconduct—would not be served by refusing to consider the good-faith exception under these circumstances. Notwithstanding the growing awareness of Fourth Amendment issues, it is questionable that an objectively reasonable prosecutor seeking a warrant pursuant to the statutory formula, or an objectively reasonable officer exercising such a warrant, should be charged with knowledge of the unconstitutionality of the statutory provisions. Tradition and habit often have the effect of dulling inquiry. The Court feels that an objectively reasonable law enforcement official—faced with a system of long pedigree and both legislative and judicial approval—might well have failed to recognize the constitutional inadequacy of the Arkansas system for obtaining warrants. There appears to be nothing, in short, in the development and continued execution of the current system that can be interpreted as the sort of affirmative executive-branch misconduct which the exclusionary rule was meant to deter.

■ However, to establish that the good-faith exception *might* be available in a case of this sort is not to establish that the exception necessarily *does* apply under the instant facts. Indeed, the Court is per-

suaded that the exception does not apply in this case because the prosecutor failed to observe the statutory scheme. Ark.Stat. Ann. § 43–409 provides that a prosecutor seeking an arrest warrant in circuit court may do so by filing a written information *"under oath"* to the justice of the peace (emphasis added). This statute echoes the language of the Fourth Amendment and article II, section 15 of the Arkansas Constitution, which both direct that "no warrant shall issue except upon probable cause *supported by oath or affirmation"* (emphasis added). As noted above, the Supreme Court clearly stated in *Gerstein* that the prosecutor's oath of office would not suffice to meet this constitutional requirement. 420 U.S. at 117, 95 S.Ct. at 804. Although there is no mention of an oath or affirmation in Ark.Stat.Ann. § 22–751, which directs the municipal clerk to issue a warrant upon the filing of an information by the prosecuting attorney, the Court considers such a requirement implicit in the statute. *See Grega v. Somers*, 178 Conn. 207, 423 A.2d 873 (1979) (to avoid conflict with Fourth Amendment, statute construed to require that prosecutor's information be supported by a complaint setting out the underlying facts). The express reference to an affidavit in section 22–752 might at first blush appear to imply that no affidavit is required in the procedure set forth in the previous section of the statute. The Court considers it more reasonable to conclude, however, that the latter section makes the explicit reference to an affidavit because under this alternative the approved affidavit represents the *sole* document on which issuance of the warrant is based. It is noteworthy that the emergency clause appended to both statutes makes reference to the preparation of "a proper affidavit and warrant"—language confirming the legislative intention that an adequate affidavit accompany every application for a warrant. That this intention was clearly communicated becomes more apparent when one considers that the information form used in this instance has a separate section re-

nations out of the judicial branch is more evident when a magistrate, rather than a clerk,

does the actual rubber-stamping.

served exclusively for a declaration constituting the affidavit.

The Court has already concluded in section I.A.2 above that the affidavit of Officer Sylvester was, simply, conclusory and therefore inadequate to fulfill the constitutional requirements for an affidavit supporting the issuance of an arrest warrant. The Court appreciates that Officer Sylvester may have communicated further details orally to the prosecuting attorney, but it is axiomatic that any such communication cannot serve to remove the constitutional taint. While it is the case that some jurisdictions permit issuance of arrest warrants on the basis of sworn oral testimony to a magistrate, see, e.g., *State v. Cook*, 404 So.2d 1210 (La.1981), there was no oath taken by Officer Sylvester with respect to his conversations with the prosecuting attorney in this case. *See State v. Burtis*, 664 S.W.2d 305 (Tenn.Crim.App.1983) (warrant based on unsworn telephone statements by officer invalid). There was, in short, a breach of what the Court sees as a clear requirement of the law. The Court may not therefore allow the law enforcement officers to rely on the good-faith exception. *Whiteley*, 401 U.S. at 568, 91 S.Ct. at 1037.

### 4. *The issue of pretextual arrest.*

■ Given the Court's conclusion below that probable cause existed to arrest petitioner for the Mason murder, the Court need not address his contention that police relied on the Oberle warrant as a pretext to arrest him for questioning regarding the Mason murder. The Court will note for the record, however, that if it had determined that the warrant in the Oberle assault was valid, it would not have deemed petitioner's allegations of pretext a sustainable challenge to the arrest. In *Richardson v. State*, 288 Ark. 407, 411, 706 S.W.2d 363 (1986), the Arkansas Supreme Court noted that the issue of pretextual arrests arises when surrounding circumstances indicate that the arrest constitutes a mere sham used to excuse conducting a search without probable cause for evidence of a more serious crime. Petitioner has directed the Court to no authority to support the contention that he could successfully challenge a valid arrest for a serious crime merely because subsequent interrogation provided evidence that he had committed an even more serious crime. In *Hines v. State*, 289 Ark. 50, 55, 709 S.W.2d 65 (1986), the Supreme Court set forth the following test:

> Confusion can be avoided by applying a 'but for' approach, that is, would the arrest not have occurred but for the other, typically the more serious, crime.... Where the police have a dual motive in making an arrest, what might be termed the covert motive is not tainted by the overt motive, even though the covert motive may be dominant, so long as the arrest would have been carried out had the covert motive been absent.

Given the seriousness of *both* crimes and the fact that the assault warrant had already been issued—and, indeed, efforts to execute the warrant had been made—*before* the murder occurred, the arrest cannot be characterized as pretextual. Petitioner may be correct in noting that police stepped up their efforts to find him once he became a murder suspect. In itself, however, this conclusion does not warrant categorizing the arrest as pretextual.

### B. WARRANTLESS ARREST: THE ISSUE OF PROBABLE CAUSE

#### 1. *The Oberle assault.*

■ Given the inadequacy of the warrant, the question becomes whether probable cause existed to effect a warrantless arrest. *See United States v. Rose*, 541 F.2d 750 (8th Cir.1976). Probable cause to effect a warrantless arrest exists when the facts and circumstances within the authorities' collective knowledge and of which they have reasonably trustworthy information would warrant a man of reasonable caution in the belief that the suspect had committed the offense for which he was to be arrested. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Roderick v. State*, 288 Ark. 360, 705 S.W.2d 433, 435 (1986). Under this standard, the Court finds probable cause existed to arrest petitioner for the Mason murder, but not for the Oberle assault.

In explaining the basis for his belief that petitioner was involved in the Oberle assault, Little Rock police officer Ivan Jones testified at the hearing on the petition for a writ of habeas corpus that he had obtained the information from an informant who had never been wrong in his tips, but who did show a tendency to embellish his stories. Officer Jones indicated that the informer had received the information from an unnamed source. Officer Jones' testimony regarding the reliability of the informer should be considered in conjunction with a tip he recorded in the Pulaski County Sheriff Department's file on the Mason murder, since the informant in that case was the same as in the Oberle case. In the Mason file, Officer Jones described the informant as follows: "The source has given reliable information in the past but about 50% of the time the information is not correct or greatly enhances his information to make it look like he knows more than he actually does." Officer Jones advised Officer Sylvester that his informant was generally reliable.

The Court perceives a certain tension between Officer Jones' testimony at the hearing and his description of the informant in the Mason file. Even assuming, however, that the informant's past reliability were established, the Court could still not conclude that the Oberle tip created the necessary probable cause to arrest the petitioner. In *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court established a totality of the circumstances test for determining the existence of probable cause. The Court expressly noted that its previous decisions "have consistently recognized the value of corroboration of details of an informant's tip by independent police work." *Id.* at 241, 103 S.Ct. at 2334. Quoting its earlier opinion in *Jones v. United States*, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1959), the Court observed that "in making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.' "

*Id.* 462 U.S. at 242, 103 S.Ct. at 2334. Even in applying the more relaxed standard reserved for reviewing probable cause determinations made by a magistrate, the Court in *Gates* made it clear that it could not uphold the magistrate's probable cause determination absent a showing that police had uncovered sufficient corroborating details to confirm the reliability of the anonymous tip. *See id.* at 241–46, 103 S.Ct. at 2333–36. In the present case, the informant's tip and the subsequent arrest were based solely upon "extended" hearsay, which the police apparently made no effort independently to verify. These factors, together with some confusion in the record as to the informant's past reliability, compel the conclusion that the police lacked probable cause to arrest petitioner for the Oberle assault.

#### 2. *The Mason murder.*

█ However, application of the *Gates* standard to police conduct in the Mason investigation reveals that police did have probable cause to make a warrantless arrest in that case. The Pulaski County Sheriff's Department file of the investigation (Joint Exhibit G) reveals the following chronology. On February 26, 1983, Ms. Mason was raped and murdered. On that same date, Officer Ferguson pursued two black suspects driving what was later identified as Ms. Mason's car. The suspects escaped. On the next day, police discovered Ms. Mason's body and, among other things, a baseball cap bearing the inscription "CAT Diesel Power." On the following day, Lt. John Hale reported that the hat resembled one he had seen worn by petitioner, who had aided police in the past in setting up drug buys. On the same date, Officer Wayne Chaney, who had worked closely with petitioner in the drug investigations, confirmed the resemblance. On March 1, Ms. Carolyn Cotham of Cotham's Store in Scott indicated to police that she had seen petitioner wear the hat about a week earlier.

On March 2, petitioner's girlfriend, Thelma Bradford, informed police that petitioner, intending to escape by bus to California,

had arranged to be taken to the station in Conway by his mother and a friend, Edward Coleman. Ms. Bradford provided police with the departure time of the bus. The authorities subsequently stopped the bus at Russelville, where petitioner apparently avoided custody by simply walking away.

On March 3, Officer Chaney received a tip from a confidential informant that petitioner and petitioner's brother had raped several women in the past. The women were reportedly afraid to come forward because they felt petitioner was dangerous. On the same date, Officer Jones received a tip from the same informant who had provided the information regarding petitioner in the Oberle case. Rather than merely naming petitioner as Ms. Mason's murderer, the informant provided information that police had independently confirmed. He told police, for instance, that petitioner's brother had said the police had stopped them driving Ms. Mason's car, but that they had gotten away. This story is consistent with the events that occurred when Officer Ferguson pursued the suspects in Ms. Mason's car. He further claimed personal knowledge that petitioner's mother had borrowed a pickup truck to get him out of town—a scenario consistent with Ms. Bradford's account and confirmed by the fact that petitioner was indeed on the bus Ms. Bradford had identified.

On March 4, Ms. Bradford reported that petitioner had told her by phone that he was lost approximately 100 miles from the point at which he had escaped from the bus. Acting on this information, police searched for and later located petitioner and arrested him.

At the time of the arrest, then, police had received various reports that the hat found at the scene of the murder appeared to be petitioner's; that petitioner had a history of sexual assault in the company of his brother; that petitioner and his brother had kidnapped, raped and murdered Ms. Mason; that the pair had escaped from the scene of the crime in a manner identical to that actually witnessed by the police; and that petitioner was actively seeking to evade capture. This combination of evidence gathered from various sources, including the police themselves as parties familiar with petitioner's habits, constitutes a mutually corroborating network of information which, in the Court's estimation, clearly serves to establish probable cause under the totality standard set forth in *Gates*.

### 3. *Breaking of the causal chain.*

The Court has thus far concluded that the Oberle warrant was defective; that the good-faith exception to the warrant requirement does not apply; that the police lacked probable cause to effect a warrantless arrest for the assault; and that the police had probable cause to effect a warrantless arrest for the murder. In the event that all these conclusions except the last withstand review, the question will be whether sufficient intervening circumstances existed to break the causal connection between the illegality and the confession, thereby purging the taint of the illegality. *See Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The Court will therefore express its conclusion on this issue. The Supreme Court clearly indicated in *Brown* that a mere determination that a suspect has been given his *Miranda* warnings and that the ensuing confessions were voluntary under the Fifth Amendment will not suffice to purge the taint of a Fourth Amendment violation. 422 U.S. at 601–04, 95 S.Ct. at 2260–62. After noting that a determination in each case must turn on the specific facts of that case, the Court set forth the following guidelines:

> The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant.... The voluntariness of the statement is a threshold requirement. Cf. 18 U.S.C. s3501. And

the burden of showing admissibility rests, of course, on the prosecution.

*Id.* at 603–04, 95 S.Ct. at 2261–62. (Footnotes and citations omitted.)

While recognizing that no purposeful or flagrant official misconduct occurred in this case and that the confessions were voluntary (see "Findings of Fact" above and further discussion *infra* ), the Court is persuaded that respondent has not met its burden under this standard. The state has merely offered the conclusion that intervening circumstances existed to purge the taint of the illegal arrest, rather than indicating what circumstances these were. The state's reticence on this issue is understandable, since the Court is unable to ascertain any circumstances in this case that would qualify as "intervening." Petitioner's three confessions occurred in the middle of the night of his arrest, following his sustained sojourn in the woods, violent arrest and constant supervision by officers eager to elicit his statement. A confession under such circumstances cannot be considered "sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." *Id.* at 603, 95 S.Ct. at 2261. This situation is far different from that in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), in which the intervening circumstances between an unlawful arrest and the confession consisted in the suspect's release on his own recognizance for several days following arraignment. Respondent's argument must therefore be rejected.

## II. THE VOLUNTARINESS OF THE CONFESSIONS

■ Petitioner contends his confessions were coerced from him in violation of the Fifth and Fourteenth Amendments. Although the issue of the voluntariness of a confession is a legal question requiring independent federal determination in a habeas corpus proceeding, *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), state court factual determinations are entitled to a presumption of correctness. *Woods v. Armontrout,* 787 F.2d 310, 313 (8th Cir.1986). Moreover, on the

ultimate issue of voluntariness, the federal court should give great weight to the state judiciary's conclusions. *Id.* at 314.

■ Petitioner maintains that the record fails to support the state court's conclusions as to the voluntariness of the confessions. At the suppression hearing, he contended that Sheriff Robinson threatened him with death, put a shotgun in his face and hit him on the head with the barrel. He also argued that he was attacked without provocation during his arrest by a police dog. Petitioner suggests that his version of events is supported by the testimony of a former Russellville policeman in an unrelated action.

This Court's factual findings do not support petitioner's contention. *See* "Findings of Fact," *supra.*

■ Petitioner further contends that testimony on an ultimate issue is barred under Ark.R.Evid. 704, and that it was consequently error to allow police to testify that the confessions were voluntary. Petitioner's reading of Rule 704 appears contrary to the express language of the statute: "Testimony in the form of an opinion or inference, otherwise admissible, is not objectionable because it embraces an ultimate issue to be tried by the trier of fact." In *Gramling v. Jennings,* 274 Ark. 346, 348, 625 S.W.2d 463 (1981), however, the Arkansas Supreme Court rejected a doctor's testimony that a colleague was not negligent, remarking that "[i]t is difficult to draw a line between opinion testimony that merely embraces the ultimate issue and opinion testimony that tells the jury which result to reach." *Gramling* is distinguishable from the present case in that the determination of voluntariness is always made by a judge, who is not likely to feel compelled to any conclusion by a mere expression of opinion. Moreover, the testifying officers provided detailed descriptions of petitioner's treatment and behavior, rather than mere conclusions. In the language of *Gramling,* the officers' opinion testimony can accordingly be described as "merely embrac[ing] the ultimate issue."

Petitioner further suggests he was coached regarding his confessions during the period of his transport from Russellville to Little Rock. In support of this contention, he points to his videotaped statements as reflecting the rote delivery of one who has clearly memorized testimony beforehand. Respondent counters that a borderline illiterate with an I.Q. of 87 could not possibly have memorized the amount of material testified to by petitioner so shortly after his arrest. Whatever petitioner's powers of retention may be, the Court is persuaded by the testimony relating to the events leading up to the taking of the videotaped statement and by its viewing of the tapes that his statements were spontaneous and unrehearsed. The Court specifically finds that petitioner was not instructed or coached regarding the content of his confessions during the trip to Little Rock, while being held in Little Rock, or, indeed, at any time after his apprehension in Russellville. This Court agrees with the state trial court, and so finds, that petitioner's statements were given voluntarily. Petitioner's second ground for relief is thus also without merit.

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus be, and it is hereby, dismissed and all requested relief denied.