Cedric MILLER *v.* STATE of Arkansas

CR 80-6                                             601 S.W. 2d 845
Supreme Court of Arkansas
Opinion delivered June 30, 1980

*David F. Guthrie*, for appellant.

*Steve Clark*, Atty. Gen., by: *Joseph H. Purvis*, Deputy Atty. Gen., for appellee.

JOHN F. STROUD, Justice. Appellant, an eighteen year old black male, was convicted by a jury and sentenced to life imprisonment for rape, 20 years for burglary and 10 years for theft of property. He alleges five points of error on appeal. We reverse the conviction because we agree with appellant that the trial court unduly restricted the cross-examination of the victim concerning her prior statement as to the identity of the assailant.

Around midnight on January 10, 1979, Mattie Evans, a 78 year old white female, responded to a knock on the door of her residence in El Dorado. After a short conversation through a latched screen, a person whom Mrs. Evans identified to the police as appellant gained entrance to her home. The assailant forcibly raped Mrs. Evans, took a pistol from a desk drawer and fled. She testified that when she tried to fight and scream, he slapped her and twisted her arm until it cracked. As soon as he left, she telephoned the police and they were at her home within minutes. She told the police what had happened and identified her assailant as Cedric Miller, who lived down the street across from her brother. She knew Cedric Miller, as he had been in her home to visit with her brother and he had on occasion mowed her lawn. As Mrs. Evans complained of pain in her wrist and back, she was taken to the hospital where she was examined by a

gynecologist. In addition to a broken arm and numerous bruises and abrasions to her face and body, he found secretions, bleeding and bruises at the entrance of the vagina, causing him to conclude that she had been raped.

The appellant was arrested at his home at approximately 12:48 a.m., handcuffed, read the Miranda warning, taken to the station and booked. Appellant denied any knowledge of the crimes and claimed that he was elsewhere at the time they occurred. Trial was held on July 12 and 13, 1979, before a jury. Following conviction for rape, burglary and theft of property, appellant brings this appeal, alleging five points of error. We will not discuss four of the points, as we find no merit to his allegations that the evidence was insufficient to support the convictions, that his motion for directed verdict of acquittal should have been granted, that the cautionary instruction on rape should have been given in the form requested by appellant, or that the verdict and sentences were the result of passion and prejudice. However, the remaining point of error urged by appellant is meritorious − the court unduly restricted cross-examination of the victim concerning her prior statement as to the identity of the assailant.

There is no question in this case that Mrs. Evans was raped, and there is certainly ample evidence to find that a burglary and theft of property occurred as a part of the same chain of events. Therefore, the real question at trial was a determination by the jury of whether it was the defendant or someone else who committed the crimes. There was extrinsic evidenced introduced at trial which corroborated Mrs. Evans' identification of the assailant as a black male, but none positively linking appellant to the crimes. An F.B.I. agent assigned to the microscopic analysis unit testified that he found Negroid headhair on the victim's housecoat and bedding, but when he compared them to hair samples of the appellant, he found "subtle differences," making it impossible to say the hair was that of appellant. Similarly, an F.B.I. agent assigned to the serology section examined clothing of the victim and appellant for bodily fluids and compared those found with known bloody samples from both persons. The only correlation was between fluids on the victim's housecoat and the appellant's undershorts which were of the same

blood group, but this only indicated that appellant was among the 10% of the population that included the assailant. There were no fingerprints of appellant found in the victim's home, and a thorough search of appellant's home and the neighborhood failed to reveal the stolen pistol. Although semen containing sperm cells was found on appellant's undershorts and inside the fly area of his pants, both he and his girl friend testified that they had engaged in sexual intercourse earlier that evening at her home. Finally, a detective with the El Dorado police department made plaster casts of footprints in the victim's yard and flower garden that definitely matched the shoes of appellant. Appellant testified, and Mrs. Evans could not positively deny, that he had been to her house four days earlier to pick up a hammer, and while there he put the garden hose in the flower bed at her request. This brief summary of some of the most pertinent testimony is reviewed merely to show the importance of the identification of appellant by the victim, for without it appellant would likely never have been arrested and charged, but certainly a conviction could not be sustained.

During the cross-examination of the victim, Mr. James, the attorney for appellant, attempted twice to interrogate her about the statement she made to the officers at the hospital concerning her prior identification of appellant as the assailant. The prosecuting attorney, Mr. Kinard, objected both times.

> Q. Do you recall being asked on that occasion on the night that it happened if you knew who did it? Do you recall being asked that question?
>
> A. No, but I'm sure I was.
>
> Q. The question was, 'Do you know him?' And your answer . . .
>
> Mr. Kinard: Objection, your Honor.
> He had asked her if she recalled and asked the question — she said, 'No, she didn't recall.' And he's attempting at this time to impeach her on something she has not said she recalled. It's not proper. I object.

The Court: I don't know what question he's going to ask. If you're going to do what Mr. Kinard says, you're attempting to do — I'll sustain the objection. If you're going to ask something else, go ahead.

Mr. James: (Continuing).
Q. When they asked you that night who it was, do you recall what you tol them?

A. Well, I don't recall, but I'm sure I told them it was Cedric Miller.

Q. All right. The question — 'Who was he . . .'

Mr. Kinard: Objection, your Honor. I'd like to approach the bench.

A conference was held at the bench out of the hearing of the jury. Mr. James was attempting to impeach the testimony of Mrs. Evans by virtue of a statement she purportedly made to one of the police officers. In what was apparently a taped interview that was later transcribed, the officer asked how she knew the assailant was Cedric Miller, and she replied:

I must have said it looked like, you know, Cedric. Why? Because it just looked like him, and so many niggers look alike.

The prosecuting attorney argued that to cross-examine Mrs. Evans about that purported statement was not appropriate, not relevant and was highly inflammatory because of her use of the word "nigger." Appellant's counsel argued in essence that the inconsistency within the statement was most relevant to the identification and that he should be allowed to cross-examine her about it. Following the conference at the bench, the trial court said, "I think she's answered your questions. I think that complies with what she said right here in that statement. I'll sustain the objection." The state argues on appeal that the evidence is irrelevant, but if relevant, should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. Rules 401 and 403, Uniform Rules of Evidence.

We disagree with both contentions as well as the argument of the state that the attorney for appellant could have rephrased the question and substituted the word "blacks" for "niggers," as the trial court's ruling indicated the matter was closed.

Mrs. Evans made several inconsistent statements to the officers and physicians concerning the details of her traumatic experience, particularly as to the conversation at her front door with the assailant before he entered and whether she was sleeping or reading when he knocked. It is certainly understandable that a 78 year old lady just beaten and raped in the early morning hours might be addled and confused, but this is all the more reason why the appellant should have been allowed to cross-examine her about her inconsistent statement made to the officers concerning her identification of the appellant.

The right of free and unfettered cross-examination of the accuser by the accused is basic to our system of justice. It has been said countless times by this and other courts, but perhaps never clearer than by Justice Mehaffy in *Smith* v. *State*, 200 Ark. 1152, 143 S.W. 2d 190 (1940):

> It is a fundamental rule of the English common law, embodied in both the state and federal constitutions as a part of the declaration of rights, that in all criminal prosecutions the accused shall have and enjoy the right to be confronted by the witnesses against him. To be confronted by the witnesses against him does not mean merely that they are to be made visible to the accused, so that he shall have the opportunity to see and to hear them, but it imports the constitutional privilege to cross-examine them. The right of cross-examination is a substantive right, and a most valuable and important one. By it the accused can test the interest, prejudice, motive, knowledge, and truthfulness of the witness, and nothing can be substituted for this right of cross-examination.

We cannot say the error in the court's restriction of the cross-examiation of the victim by the accused was harmless in this case, as appellant received the maximum prison sen-

tence possible on all three charges. The case is reversed and remanded for retrial in a manner not inconsistent with this opinion.

Reversed and remanded.