Carl Lee LINELL *v.*
STATE of Arkansas

CR 84-9                              671 S.W.2d 741

Supreme Court of Arkansas
Opinion delivered July 9, 1984

*Cross, Kearney & McKissic,* by: *Gene E. McKissic,* for appellant.

*Steve Clark,* Att'y Gen., by: *Michael E. Wheeler,* Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. This is an appeal brought by Carl Linell from a conviction for the capital murder of Charles and Louise Misho and the attempted capital murder of Austin Patterson, who survived a bullet wound to the

stomach. All three were shot with a small caliber weapon around 7:00 p.m. on January 12, 1983 during the commission of an aggrevated robbery outside the 79 Bar and Grill in Pine Bluff.

Five days later Carl Linell, Carvin Thompson and Mamie Guy Curry were charged with the crimes. Thompson entered into a plea agreement for a sentence of life without parole and agreed to testify for the state. Linell was tried on July 11, 1983, convicted and sentenced to life without parole for two counts of capital murder and twenty years for attempted capital murder, the sentences to run consecutively. Charges against Mamie Guy Curry were dismissed for lack of evidence. The appellant raises seven points for reversal, none of which are persuasive.

Carl Linell argues the trial court abused its discretion by not excusing one of the jurors for cause. The juror had indicated on a questionnaire that his business had been robbed and there had been acts of violence against his family. When asked if these events would make him predisposed about crime one way or another, the juror responded, "No, in a case like this, as serious as it is, I certainly wouldn't be predisposed." He said that he was not biased and would be fair and impartial. Appellant contends there is a clear assumption that the juror was biased and as he had used all his peremptory challenges, it was reversible error to hold a biased juror competent. The cases appellant cites to support his contention involved implied, rather than actual, bias. Implied bias arises by implication of law and its liberally construed in criminal cases. See Ark. Stat. Ann. § 43-1920; *Beed* v. *State,* 271 Ark. 526, 609 S.W.2d 898 (1980); *Henslee* v. *State,* 251 Ark. 125, 471 S.W.2d 352 (1971). An entirely different standard applies to actual bias, which is the issue here. When actual bias is in question, the qualification of a juror is within the sound discretion of the trial judge because he is in a better position to weigh the demeanor of the prospective juror's response to the questions on voir dire. *Allen* v. *State,* 281 Ark. 1, 660 S.W.2d 922 (1983). Jurors are assumed to be unbiased and the burden of demonstrating actual bias is on the appellant. *Jeffers* v. *State,* 280 Ark. 458, 658 S.W.2d 869 (1953). In *Jeffers* we

found no proof of bias where jurors on appellant's panel had also served as jurors in a trial for the murder of the prosecutrix's sister, and in *Allen* we found no abuse of discretion in the court's refusal to excuse veniremen who knew two police officers expected to testify, but who could lay aside their friendship and weigh the testimony as that of a stranger.

Appellant Linell has not demonstrated actual bias and asks that we assume such bias was present. The juror was questioned on the issue and his responses were satisfactory to the trial judge. On review we are not in a position to assume actual bias, or to say that the trial court's discretion was abused in holding otherwise.

The second and third arguments are essentially one. Linell contends his cross examination of accomplice Carvin Thompson on prior inconsistent statements about the shooting was unduly restricted and this denied him the right to be confronted with the witnesses against him under the Sixth Amendment to the Constitution. The appellant complains that he should have been permitted to cross examine Thompson on the statements to point out for the jury the incorrect details in each statement and how Thompson's story changed as he was fed information by the police. He cites Arkansas Uniform Rules of Evidence, Rule 613 (b) and previous cases[1] to support his position. Rule 613 (b) provides in pertinent part:

> (b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require.

Neither the rule nor the cases support the arguments. Rule 613 (b) provides for the introduction of prior inconsistent

---

[1]*Eddington* v. *State,* 225 Ark. 929, 286 S.W.2d 473 (1956); *Comer* v. *State,* 222 Ark. 156, 257 S.W.2d 564 (1953); *Humpolack* v. *State,* 175 Ark. 786, 300 S.W. 426 (1927); *Billings* v. *State,* 52 Ark. 303, 12 S.W. 574 (1889).

statements and gives the witness the opportunity to deny or explain the statements, which was done in this case. The cases cited only support the theory of application of Rule 613 (b) and neither the statute nor those cases give any support for the type of cross examination appellant argues is appropriate.

All prior statements were read to Thompson, which he acknowledged and admitted were not true. He was cross examined on the circumstances surrounding the statements and the court allowed considerable latitude before limiting the questioning, including the repeated suggestion that Thompson's statements were influenced by the police. In *Beed* v. *State,* 271 Ark. 526, 609 S.W.2d 898 (1980), a similar argument was made by the appellant as to undue restriction of cross examination while impeaching the state's witness, the victim. The trial court sustained the objection to a question it found repetitious and argumentative and we upheld the ruling. We noted Ark. Unif. R. Evid. 611 (a) gives the trial court reasonable control over the mode of interrogating witnesses so as to avoid needless consumption of time and to protect the witness from harassment. The appellant has provided no supporting authority, nor does he show how his defense would have been fostered by this line of questioning. The issue he wanted was brought before the jury and the most that can be said of the point is that he was not permitted to question as extensively as he might have liked. But that right is not unlimited where discretion is not abused.

Appellant suggests that he was entitled to introduce evidence of other robberies committed by Carvin Thompson for which the state had elected not to file charges. But neither the proffer nor the ruling appear in the abstract and we will not consider the argument. Rule 9 (d) Rules of the Supreme Court and the Court of Appeals. *Adams* v. *State,* 276 Ark. 18, 631 S.W.2d 828 (1982); *Byers* v. *State,* 267 Ark. App. 1097, 594 S.W.2d 252 (1980); *Vail* v. *State,* 267 Ark.App. 1078, 593 S.W.2d 491 (1980); *Ellis* v. *State,* 267 Ark.App. 690, 590 S.W.2d 309 (1979).

Two other closely related points are treated as one:

Appellant's motion for a directed verdict should have been granted because the testimony of the accomplice, Carvin Thompson, was not sufficiently corroborated and because the evidence did not support the verdict. The arguments are lacking, however, as there was substantial evidence to support the verdict and appellant's connection with the crime was established by proof beyond that supplied by the accomplice.

Carvin Thompson testified that he and the appellant had been drinking beer and playing dominos with Mamie Guy Curry at Eva Cato's house on January 12. Sometime around dark, he said, Mamie, appellant and he left to go to a liquor store on Highway 79. He had a shotgun and Linell had a pistol and while Mamie Guy Curry was in the liquor store they decided to rob someone. After walking Mamie Guy Curry to Eva Cato's house they went back and waited near the 79 Bar and Grill. When a pickup truck pulled in Linell shot both occupants of the truck (the Mishos) and a third individual (Patterson) who came out of the bar to investigate the noise. They ran back to Eva Cato's house with the purse and billfold of the victims, where they removed their clothing, which Mamie Guy Curry concealed in a bathroom cabinet. The purse was placed behind a couch and later retrieved by Linell.

Appellant relies on our statute, Ark. Stat. Ann. § 43-2116 (Repl. 1977):

> A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof. Provided, That in misdemeanor cases a conviction may be had upon the testimony of an accomplice.

The test for determining the sufficiency of corroborating evidence is whether, if the testimony of the accomplice is disregarded, there is other, independent evidence to establish the crime and connect the defendant with its

commission. *Henderson* v. *State,* 279 Ark. 435, 652 S.W.2d 16 (1983); *Froman* v. *State,* 232 Ark. 697, 339 S.W.2d 601 (1960). The corroborating evidence may be circumstantial, so long as it is of a material nature and tends to connect the defendant with the crime. *Pollard* v. *State,* 264 Ark. 753, 574 S.W.2d 656 (1978); *Roath* v. *State,* 185 Ark. 1039, 505 S.W.2d 985 (1932). False statements to the police by the defendant may constitute corroborating evidence. *Bly* v. *State,* 267 Ark. 613, 593 S.W.2d 450 (1980).

The independent evidence of Linell's involvement in the crime is entirely sufficient. The victims were shot with the pistol which was in his possession, according to Eva Cato's testimony, immediately after Linell and Thompson returned to her house from what had been thought to be a trip to the liquor store. She said they both removed their outer clothing, which was hidden, and Mamie Guy Curry concealed Linell's pistol in her bra. She said Linell put a woman's purse behind her couch and took it with him when he left. Linell gave conflicting versions to the police of his whereabouts on the evening of the crimes and other evidence placed him in the vicinity of the crimes at the time they occurred. We have no difficulty in determining that independent, material evidence was offered which connected appellant to the crimes for which he was convicted.

Finally, appellant insists the trial court erred in seating a death qualified jury, citing *Grigsby* v. *Mabry,* 569 F. Supp. 1273 (1983). However, we have rejected the premise of death qualified juries in several cases, notably in *Rector* v. *State,* 280 Ark. 385, 659 S.W.2d 168 (1983).

We find no prejudicial error in any other matters brought to our attention under Rule 11 (f).

Affirmed.

PURTLE and HOLLINGSWORTH, JJ., dissent.

JOHN I. PURTLE, Justice, dissenting. I believe the trial court unduly limited cross-examination of witness Thompson. In order to place the issue in proper perspective I set out

what I perceive to be the error. The witness and co-defendant had made several prior statements about the crime. The witness admitted that the statements were untrue and the following then took place:

> *Defense:* I would like to go through the statement and give the various versions he gave because we know that he was told it couldn't happen that way and he brought his testimony in conformity with the prosecution theory.

> *State:* Mr. McKissic may ask Mr. Thompson if he made each and every statement and once he says he made it go to the next one. But he is not entitled to cross-examine him on these statements.

> *Court:* Your objection is well taken. Mr. McKissic you may ask him if he made prior inconsistent statements. He can either admit or deny them but you may not cross-examine on statements he knows to be false. If he says the statement is true you may cross-examine him on it.

I do not understand the ruling of the trial court to be in keeping with the law and our prior opinions. We stated in *Miller* v. *State,* 269 Ark. 409, 601 S.W.2d 845 (1980): " The right of free and unfettered cross-examination of the accuser by the accused is basic to our system of justice." In *Miller* we quoted from *Smith* v. *State,* 200 Ark. 1152, 143 S.W.2d 190 (1940) in part as follows: "The right of cross-examination is a substantive right, and a most valuable and important one." Both *Miller* and *Smith* were reversed because of restrictions on cross-examination. The appellant should have full opportunity to test the credibility and trustworthiness of a witness. *Rhodes* v. *State,* 276 Ark. 203, 634 S.W.2d 107 (1982); *Gustafson* v. *State,* 267 Ark. 278, 590 S.W.2d 853 (1979). Both *Rhodes* and *Gustafson* were reversed. We have always reversed before and we should do it again.

P. A. HOLLINGSWORTH, Justice dissenting. Appellant urges us to oveturn our ruling in *Rector* v. *State,* 280 Ark. 385, 659 S.W.2d 168 (1983) because individuals with conscientious objections to the death penalty were excluded

from participating in his trial. Appellant asserts that he was denied his rights under the Sixth and Fourteen Amendments to the federal constitution to have his guilt determined by a fair cross-section of the community. I agree and dissent from the majority opinion for this reason.

The mandate that a jury be drawn from a fair and representative cross-section of the community is not unique to Arkansas law. *Hall* v. *State*, 259 Ark. 815, 537 S.W.2d 155 (1976); *Sanford* v. *Hutto*, 394 F. Supp. 1278 (E.D. Ark., 1975), affirmed 523 F.2d 1383 (8th Cir., 1975); *Jewell* v. *Stebbins*, 288 F. Supp. 600 (E.D. Ark., 1969). The United States Supreme Court has frequently affirmed this concept. *Smith* v. *Texas*, 311 U.S. 128 (1940); *Thiel* v. *Southern Pac. Co.* 328 U.S. 217 (1946); *Peters* v. *Kiff*, 407 U.S. 493 (1972). In *Taylor* v. *Louisiana*, 419 U.S. 522 (1975), the Court held that "the selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial."

The right to be tried by a jury drawn fairly from a representative cross-section of the community is critical for a variety of reasons:

> The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response.

*Duncan* v. *Louisiana*, 391 U.S. 145 at 155-156 (1968).

A commentator on this issue has stated, " the absence of a group from petit juries in communities where the group represents a substantial portion of the population may lead to jury decisionmaking based on prejudice rather than reason." See Note, *Limiting the Peremptory Challenge: Representation of Groups on Petit Juries,* 86 Yale L.J, 1715, 1730-1731 & N. 69.

Community participation in the administration of the

criminal law, more over, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

*Taylor, supra.* 419 U.S. at 530-531.

I disagree with the statement by the majority in *Rector* that:

a jury system that has served its purpose admirably throughout the nation's history ought not to be twisted out of shape for the benefit of those persons least entitled to special favors. It has always been the law in Arkansas, except when the punishment is mandatory, that the same jurors who have the responsibility for determining guilt or innocence must also shoulder the burden of fixing the punishment. That is as it should be, for the two questions are necessarily interwoven.

It is conceivable that the law has developed in this area to the point that it is permissible for the State to bar jurors with conscientious objections to the death penalty from serving on sentencing juries. *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968). My reading of *Witherspoon* leads me to the conclusion that if further study prove that juries death-qualified by *Witherspoon* standards were less than neutral with respect to guilt it mandated a two phase trial — one phase to establish guilt and one phase for sentencing. *Grigsby* v. *Mabry,* 569 F. Supp. 1273 (1983) requires us to devise the two phase remedy. The empirical evidence in *Grigsby* that jurors who favor the death penalty are more likely to vote to convict defendants than jurors who oppose capital punishment requires us to adopt a modification of our criminal trial in this area. See Berry, *Death Qualification and the "Fireside Induction"* 5 UALR L.J. 1 (1982). I would not allow individuals with conscientious objections to the death penalty to be excluded from participating in the liability phase of appellant's trial. I would reverse for that reason.