Lonnie MITCHELL *v.* STATE of Arkansas

CR 87-155                                      750 S.W.2d 936

Supreme Court of Arkansas
Opinion delivered May 2, 1988

*Shermer & Walker*, for appellant.

*Steve Clark*, Att'y Gen., by: *R.B. Friedlander*, Solicitor General, for appellee.

DAVID NEWBERN, Justice. The appellant, Lonnie Mitchell, was convicted of kidnapping, rape, and battery resulting from a single incident. He received separate life sentences on the kidnapping and rape convictions and thirty years imprisonment on the battery conviction. We must reverse the convictions because of error which occurred in the selection of the jury. We will address some of the other points raised for reversal in case they arise upon retrial.

The victim was a young white female who testified that, while driving her car home from her boyfriend's apartment at 2:30 a.m. on June 4, 1986, she heard a call for help from the vicinity of a car that appeared to be stuck in a ditch. She stopped, thinking someone might have been hurt. A person she later identified as Mitchell, a black man eighteen years old at the time, approached her and asked her to use her car to pull his from the ditch. She declined but offered to take him to the police station. He refused that offer, but he got in her car, after reaching through the open window to unlock the door, and gave the victim directions supposedly to the place where he lived. They wound up in a cul-de-sac behind a grocery store where he asked her to engage in sexual intercourse with him. She refused, and he then brutally beat and raped her.

### 1. Jury selection

In the process of selecting the petit jury, the sole black venireman, Roger Petty, was questioned as follows:

> BY MR. BYNUM: Mr. Petty, my name is John Bynum and I'm the Prosecuting Attorney. Where are you employed, please sir?
>
> BY MR. PETTY: Arkansas Power and Light.
>
> BY MR. BYNUM: The Defendant in this case is charged with the crimes of rape, kidnapping and first

degree battery. The maximum punishment for rape is life in the penitentiary. Do you think that's too severe a punishment?

BY MR. PETTY: No.

BY MR. BYNUM: The maximum punishment for kidnapping is life in the penitentiary. Do you think that's too severe a punishment?

BY MR. PETTY: No.

BY MR. BYNUM: The punishment for first degree battery is a term of years in the penitentiary. Does that give you any problems?

BY MR. PETTY: Huh, um.

BY MR. BYNUM: Now, Mr. Petty, if you are selected as a member of this Jury and you are satisfied beyond a reasonable doubt that the Defendant committed one or more of these offenses, could you and would you find him guilty?

BY MR. PETTY: I could.

BY MR. BYNUM: Well, would you?

BY MR. PETTY: If I'm selected?

BY MR. BYNUM: And, you are satisfied beyond a reasonable doubt.

BY MR. PETTY: Without a reasonable doubt, yes, I could.

BY MR. BYNUM: And, having done that could you and would you consider sending him to the penitentiary?

BY MR. PETTY: Yes, I could.

BY MR. BYNUM: Well, would you consider that?

BY MR. PETTY: Yes.

BY MR. BYNUM: All right. Now, Mr. Petty, have you read anything in the newspaper or heard anything about this case on the radio?

BY MR. PETTY: No, I haven't.

BY MR. BYNUM: Do you know anything at all about it?

BY MR. PETTY: No, I don't because like I said I haven't read anything about it.

BY MR. BYNUM: Do you have an opinion at this point as to whether or not the Defendant is guilty or is your mind still open on that point?

BY MR. PETTY: My mind is open until I find out the facts.

BY MR. BYNUM: Now, Mr. Petty, if you are selected as a member of this Jury Panel, could you decide the case solely on the basis of the facts that you hear in the Courtroom and the law that the Judge instructs you?

BY MR. PETTY: Yes, I could do that.

BY MR. BYNUM: Okay. Do you think you could give the Defendant a fair trial?

BY MR. PETTY: Yes.

BY MR. BYNUM: Do you think you can give the State a fair trial?

BY MR. PETTY: Yes, I do.

At that point, the inquiry turned to racially oriented questions and was as follows:

BY MR. BYNUM: Now, it is obvious that the Defendant is black in this case and you are also black. Is that going to give you any problem sitting in judgment on a black man who is alleged to have had sexual intercourse with a white woman?

BY MR. PETTY: No.

BY MR. BYNUM: Do you think that will bother you any? Would there be any pressure on you to find this man not guilty because he's black and because you're black.

BY MR. PETTY: No.

BY MR. BYNUM: Do you know any reason why you can't serve as a member of this Jury Panel?

BY MR. PETTY: No.

BY MR. BYNUM: Pass the witness.

Thereafter, defense counsel asked some questions as follows:

BY THE COURT: Ms. Walker.

BY MS. WALKER: Mr. Petty, if you were on trial today and I was picking a jury for you, do you think you would have the frame of mind that you would want your Jury to have if you were in Lonnie's shoes? Do you understand what I am saying?

BY MR. PETTY: No.

BY MS. WALKER: Let me say it again. If you were on trial today, instead of Lonnie, and I was picking a jury for you, do you think you would have the openness or the frame of mind that you would want a Jury to have for your case?

BY MR. PETTY: Yes, I do.

. . .

BY MS. WALKER: I don't have any further questions.

Then the following occurred:

BY THE COURT: What says the State?

BY MR. BYNUM: The State will excuse Mr. Petty.

BY THE COURT: Mr. Petty, you've been excused. You're free to go. Thank you.

BY MR. BYNUM: Your Honor, may I state into the record the reason I excused Mr. Petty? I think it may be necessary to do that. I excused Mr. Petty because judging from his demeanor and the manner in which he answered the questions I'm convinced that he was not being truthful and candid in his responses to the questions that I asked him. That's the reason I excused him.

· BY MS. WALKER: Your Honor, I would like in the record that I felt Mr. Bynum was harder on the Juror than he was the other Jurors in his questioning and in his demeanor and he perhaps made the Juror a little more defensive because of his demeanor.

BY MR. BYNUM: Well, that's my prerogative.

BY MR. SHERMER: [Defense counsel] Your Honor, we'd like to put in the record also that I believe it's error. I believe he's the only black on this Jury Panel and for the Prosecutor, for no better reason than that, to exclude him I think was improper.

BY THE COURT: I think it has to be shown that it was based solely on race and for no other reason; and Mr. Bynum has stated his reasons.

BY MR. BYNUM: I think my reason is perfectly justifiable, not being truthful and honest and not being candid in his answers that he gave.

BY MR. SHERMER: Just note our exceptions.

BY THE COURT: All right.

Mitchell contends that the exclusion of the only black juror, leaving an all-white panel, made a prima facie case of discrimination and that the action of the trial court did not rise to the level of a "sensitive inquiry" in these circumstances as is required by the Supreme Court's decision in *Batson* v. *Kentucky*, 476 U.S. 79 (1986), and ours in *Ward* v. *State*, 293 Ark. 88, 733 S.W.2d 728 (1987). In response, the state's brief argues that the trial judge was unconvinced there was discrimination and that the prosecutor "stated his reasons" for excusing Petty. *Linell* v. *State*, 283 Ark. 162, 671 S.W.2d 741 (1984), is cited for the proposition that the trial judge is better able to weigh the demeanor of a prospective juror and thus may exercise his discretion in jury selection. While we agree with that general proposition and the applicability of it in cases like the *Linell* case where the question was whether a juror should have been dismissed for cause, the record here does not show that the trial court made the kind of evaluation, required by the *Batson* and *Ward* cases, of the prosecution's use of its peremptory challenge.

In *Swain* v. *Alabama*, 380 U.S. 202 (1965), the Supreme Court held that, to succeed, an allegation of racial discrimination in jury selection must be based upon a "pattern" of discriminatory use of peremptory challenges established by reference to several cases. That holding was superseded by the decision in the *Batson* case in which the Supreme Court found that the old test placed a "crippling burden of proof" on a defendant, thus effectively placing the prosecution's peremptory challenges beyond scrutiny. The Supreme Court recognized that "[a] single invidiously discriminatory governmental act" is not "immunized by the absence of such discrimination in the making of other comparable decisions," quoting from *Arlington Heights* v. *Metropolitan Housing Corp.*, 429 U.S. 252, at 266, n. 15 (1977), which involved selection of the venire.

■ In the *Ward* case we summarized the constitutional test applied in the *Batson* decision as follows:

> In *Batson*, the court held that a defendant who could make a *prima facie* case of purposeful discrimination shifts the burden to the state to prove the exclusion of jurors is not based on race. This *prima facie* case may be made by "showing that the totality of the relevent facts gives rise to an inference of discriminatory purpose." Another way is to demonstrate 'total or seriously disproportionate exclusion of Negroes from jury venires.' Another example for making a *prima facie* case is by showing a "pattern" of strikes, or questions and statements by a prosecuting attorney during *voir dire*. [293 at 92-93, 733 S.W.2d at 730]

■ Mitchell made a prima facie case of discrimination in the prosecution's use of its peremptory challenge to remove the only black prospective juror after questioning him closely on whether his race would affect his vote. Absent inquiry by the court, we have before us no factual determination whether the prosecutor was assuming Mr. Petty could not withstand the racial pressures and thus assuming he could not have been answering truthfully on that subject. The court has a duty to go beyond the prosecutor's explanation and make a "sincere and reasoned" effort to evaluate its genuineness and sufficiency "in the light of all the circumstances of the trial." *People* v. *Turner*, 230 Cal.

Rptr. 656, 726 P.2d 102, 112 (1986).

As was recently noted in *Florida* v. *Slappy*, No. 70,331 (Fla. Sup. Ct., March 10, 1988), the trial judge is not bound by the prosecutor's statement of reasons, and "[w]hile the reasons need not rise to the level justifying a challenge for cause, they nevertheless must consist of more than the assumption that [the venireman] would be partial to the defendant because of their shared race . . . ," quoting *Batson* v. *Kentucky, supra*, at 97.

Because the trial court accepted the prosecutor's explanation at face value and made no inquiry, we need not consider the explanation's validity to decide this case. We must note, however, that the explanation was one which could have been given with respect to any venire person and could be used to screen improper motive. An example of the kind of inquiry and further explanation needed when such a universal reason is given can be found in *People* v. *Charron*, 238 Cal. Rptr. 660 (Cal. App. 1987).

We have been concerned with the argument that the peremptory challenge of one potential juror cannot possibly demonstrate a prima facie case of discrimination in the sense of showing a "pattern" of discrimination, not as that term was used in *Swain* v. *Alabama, supra*, but as it was used in the *Batson* case. In *United States* v. *Chalan*, 812 F.2d 1302 (10th Cir. 1987), the accused was an American Indian. There were two American Indian venire members and each was peremptorily challenged by the government. The court concluded that one of them was subject to challenge for cause because of a language problem. That left the question whether the peremptory challenge of a single prospective juror of the same minority race as the defendant could violate the standards imposed by the *Batson* case. The court's opinion stated the following:

> The striking of a single juror of defendant's race may not always be sufficient to establish a prima facie case. However, using the reasoning as articulated in *Batson* "that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case*," we hold this was done in the instant case even though we are here concerned with only a single juror. Our conclusion comports with the notion that peremptory

challenges constitute a practice particularly susceptible to racial discrimination. Such challenges are subject to abuse in part because normally the Government need not state the reasons for its action. If all of the jurors of defendant's race are excluded from the jury, we believe that there is a substantial risk that the Government excluded the jurors because of their race. Our holding helps to avert that risk by requiring the Government to explain the reasons for its challenges when no members of a defendant's race are left on the jury. [812 F.2d at 1314. Citations omitted.]

In *Pearson v. State*, 514 So.2d 374 (Fla. App. 1987), a peremptory challenge had been used to remove the only black member of a jury venire, and no inquiry was conducted or explanation made. The case was remanded for the holding of a hearing to determine whether there was a racially neutral explanation for the exercise of the challenge. The court stated:

Applying *Batson*, as we must, we recognize that in this case there was only one black member of the jury venire and thus only one prospective black juror was removed by the state. Both *Batson* and *Griffith* [*Griffith* v. *Kentucky*, ___ U.S.___, 107 S.Ct. 708 (1987)] speak of plural challenges. In one of the cases decided in *Griffith*, however, there were only two black jurors removed. We see no difference, in terms of the equal protection clause, between the striking of the only one black juror and the striking of the only two black jurors—or the striking of the only three black jurors, or more. As observed by the court in the only case we have found dealing with the striking of the only member of the defendant's race from the jury, the result is the same regardless of number—no members of the defendant's race are left on the jury, and the prosecution should be required to explain the reasons for its peremptory challenge when that result occurs. *United States* v. *Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987). [514 So.2d at 376]

We agree with the apparent conclusion of these two courts that, where the use of a peremptory challenge results in exclusion from the jury of all members of the defendant's minority race, it is not necessary to show exclusion of more than

one minority juror of the same race as the defendant to make a prima facie case of discriminatory use of a peremptory challenge, and thus to invoke the "sensitive inquiry" requirement.

The evidence of Lonnie Mitchell's guilt is overwhelming. He was identified by the victim who described the clothing he was wearing at the time of the assault. The clothing was found in the house where Lonnie Mitchell lived, and he made a statement amounting to a confession. In some such instances we are able to put aside "technical" error by the court and affirm the conviction because, given the overwhelming evidence of guilt, the error was harmless and thus the accused was not prejudiced by the mistake. *Berna* v. *State*, 282 Ark. 563, 670 S.W.2d 434 (1984). In this situation, however, the guilt or innocence of Lonnie Mitchell and whether his defense was prejudiced is not the sole issue. We are concerned here with prejudice to the system of justice. The possibility that a juror was struck for racially discriminatory reasons is the possibility that the prospective juror concerned, all citizens, and the very system of justice have been deprived of fundamental constitutional protection to which they are entitled.

In *Gray* v. *Mississippi*, 107 S. Ct. 2045 (1987), the Supreme Court held that it was improper to have allowed the prosecution to strike for cause a prospective juror who was qualified. The Mississippi Supreme Court had affirmed the conviction because the trial judge had admitted he had required the prosecution to use peremptory challenges against jurors subject to challenge for cause due to their opposition to the death penalty, and thus he was only correcting his previous mistake. In response to the argument that the error was harmless, the Supreme Court stated that "because the impartiality of the adjudicator goes to the very integrity of the legal system, the . . . harmless error analysis cannot apply. We have recognized that 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' " The same rationale applies here. The right to a jury selected free of the taint of racial discrimination is so fundamental that it cannot be described as harmless error.

## 2. Inflammatory photographs

The defense moved to suppress introduction of twenty-one photographs of the victim depicting her injuries. The state introduced only three. One of them was an enlargement showing the swelling of and wounds to the victim's face. The contention here is that the inflammatory nature of the photographs exceeded their evidentiary value.

■ While the discretion of the trial judge is not absolute, and we will reverse if large numbers of gory pictures which are only cumulative are introduced, *Berry* v. *State*, 290 Ark. 223, 718 S.W.2d 447 (1986), we find no abuse of discretion here. We know that virtually all photographs are enlargements to some degree. We have examined the one enlargement complained of. It has not been shown that it accentuated the injuries of the victim in any prejudicial way.

## 3. Mitchell's statement

Lonnie Mitchell was taken into custody shortly after the victim had described him and his automobile to the police. While in custody he made a highly prejudicial statement admitting much of that with which he ultimately was charged. He contends that the statement was not voluntarily given and that the warning he was given was inadequate to inform him of his rights. He also contends the statement was inadmissible because the tape recording from which the transcription was introduced at the trial was not made available to him.

### a. Voluntariness

In determining whether the state has shown that a statement taken from an accused in custody was voluntary, we consider the totality of the circumstances including the age, education, and intelligence of the accused, the advice or lack of advice of his constitutional rights, the length of dentention, the repeated or prolonged nature of the questioning, and the use of physical or mental punishment. *Hatley* v. *State*, 289 Ark. 130, 709 S.W.2d 812 (1986). We do not reverse the trial court's determination of voluntariness unless it was clearly against the preponderance of the evidence. *White* v. *State*, 290 Ark. 130, 717 S.W.2d 784

(1986).

■ Mitchell's argument is that he had an I.Q. of only 81, that he had low verbal skills, that his personality was susceptible to manipulation, and that he was isolated from his grandmother, with whom he lived, and from his attorney who was representing him on other charges. A low I.Q., standing alone, will not render the waiver of the right to remain silent invalid, *Hignite* v. *State*, 265 Ark. 866, 581 S.W.2d 552 (1979); nor will low verbal skills. *White* v. *State, supra; Hatley* v. *State, supra.* Mitchell had completed the ninth grade and could read.

The record contains a statement by a psychologist that Mitchell is a fearful person subject to having his will overcome during interrogation. Two other psychologists stated that he was faking mental illness and thus skewing his test scores.

There is no showing that Mitchell was deprived of access to means to communicate with his grandmother or with an attorney. Nor is there any showing whatever of coercion or physical abuse during this detention. While he complains he was kept two hours and not offered food, there is no showing that he was unduly hungry or that he was promised food in return for a confession.

■ While Mitchell was young, he was not a juvenile. His argument that he was represented by attorneys on other charges reveals that he had been in this situation at least twice before and was thus not a novice in the police station. We find the trial judge's determination that the statement was voluntary not clearly against the preponderance of the evidence.

### b. The rights form

■ The rights form used by the Russellville Police Department was deficient in its failure to mention the fact that a lawyer would be appointed even if the accused could not afford one; however, the deficiency was cured by the testimony of Officer McMillan who informed Mitchell of his rights, took his statement, and testified that he told Mitchell that if he could not afford a lawyer one would be appointed for him. *Mayfield* v. *State*, 293 Ark. 216, 736 S.W.2d 12 (1987).

### c. The tape recording

Five days after Mitchell's statement was taken he filed a discovery request for all relevant evidence. The state did not produce the tape recording from which his statement had been transcribed because it was a tape which had been returned to a "pool" of tapes used by the police department and it had been reused and thus no longer contained Mitchell's statement.

Arkansas R. Crim. P. 17.1 provides that the prosecutor shall disclose any written or recorded statement and the substance of any oral statement made by the defendant. In *Williamson* v. *State*, 263 Ark. 401, 565 S.W.2d 415 (1978), we held a defendant is entitled to the tape from which a written statement was transcribed. We pointed out that the tape represents the best evidence and without it the defendant has no way of determining if the transcript was a correct reproduction of the recording.

The state's argument is that the *Williamson* case is distinguishable because in this case the tape is not available, and there it was available, but simply not supplied. Such a distinction should not have the effect the state would have us ascribe to it, for that would deprive the *Williamson* case of its meaning. The authorities could, with impunity, simply destroy the best evidence of what was said by the accused, and then assert its unavailability in every case.

We do not count this a reversible error here because of the overwhelming evidence of guilt of the accused, *see Berna* v. *State, supra*, and the lack of any showing that the police department acted in bad faith in destroying the tape recording. However, we caution prosecutors to see to it that such a recording is kept available for a reasonable time after a statement has been transcribed, as its "unavailability" may not save a transcription from inadmissibility in another case.

### 4. The arrest warrant

Mitchell argues that the warrant for his arrest was invalid because it was issued by the clerk of the court without authorization from the judge and was thus in violation of Ark. R. Crim. P. 7.1(c). The technical invalidity of an arrest warrant is irrelevant when the arrest has been made upon probable cause.

*Davis* v. *State*, 293 Ark. 472, 739 S.W.2d 150 (1987). There is no question but that the police had probable cause to arrest Mitchell.

Reversed and remanded.

HOLT, C.J., and HAYS, J., dissent.

JACK HOLT, JR., Chief Justice, dissenting. Though the Supreme Court's decision in *Batson* and this court's opinion in *Ward* lend some support to the majority's holding that Mitchell made a prima facie case of discrimination after the prosecution questioned Petty closely on whether his race would affect his vote, I find myself unable to accept the majority's subsequent conclusion that, standing alone:

> where the use of a peremptory challenge results in exclusion from the jury of all members of the defendant's minority race, it is not necessary to show exclusion of *more than one minority juror of the same race as the defendant to make a prima facie case* of discriminatory use of a peremptory challenge, and thus invoke the "sensitive inquiry" requirement. [Emphasis mine.]

I feel today's decision is in direct conflict with our recent decision in *Smith* v. *State*, 294 Ark. 357, 742 S.W.2d 936 (1988), and places an unwarranted burden upon the prosecution never contemplated by either *Batson* or *Ward*. Therefore, I dissent.

In one fell swoop, and without saying so, this court has overruled our decision in *Smith, supra*, in which we held that the striking of two jurors, standing alone, is not sufficient to constitute a *Batson* "pattern" which would give rise to the inference of discrimination necessary to establish a prima facie case. The result of today's decision is to ignore the delicate balance struck by the United States Supreme Court between "the prosecutor's historical privilege of peremptory challenge free of judicial control . . . and the constitutional prohibition on exclusion of persons from jury service on account of race . . . ." *Batson* v. *Kentucky*, 476 U.S. 79, 91 (1986).

What the majority holds is that in cases where there is only one juror of the same minority race as the defendant on a panel of perhaps fifty potential jurors, absent any other factors the striking of that particular juror automatically creates a prima

facie case of *purposeful* discrimination by the State which shifts the burden to the prosecution to give a sufficiently neutral explanation for the strike, all in the context of a "sensitive inquiry" by the court. Our comments in cases on this issue which have come before us vividly demonstrate the likelihood of success judges and prosecutors will have in clearly meeting their respective obligations in that regard. Today's decision will do more than merely chill the use of peremptory challenges by the prosecution, it effectively shackles the ability to exercise a method of challenge traditionally "viewed as one means of assuring the selection of a qualified and unbiased jury . . . ." *Id.*

While I wholeheartedly support the proposition set forth in *Batson* that the State's privilege to strike individual jurors through peremptory challenges is subject to the commands of the Equal Protection Clause and that the prosecutor therefore cannot challenge potential jurors solely on account of their race on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant, the majority's holding that a prima facie case of discrimination can be made by the striking of a single juror of the same minority race as the defendant, without more, flatly contradicts the notion that it is a " 'pattern' of strikes against black jurors included in the particular venire [which] might give rise to an inference of discrimination." *Id.* at 97.

I cannot accept the fact that Mitchell made a prima facie case of discrimination based solely on the strike of venireman Petty. Likewise, I cannot agree that a prima facie case was made out simply by virtue of the fact that two of the prosecutor's eighteen questions were race related, unless the evidence was convincing that the prosecutor's subsequent explanation concerning Petty's honesty was linked to Petty's responses on the issue of race. This, however, is not the case.

The record clearly shows what can best be described as "dissatisfaction" on the part of the prosecutor with Petty's demeanor when answering other questions, particularly whether Petty would find Mitchell guilty if satisfied beyond a reasonable doubt that Mitchell had committed the offenses charged, and whether Petty would consider sending Mitchell to the penitentiary. Pursuant to AMCI 104, jurors are instructed that in

determining the credibility of any witness, it is proper to take into consideration the demeanor of the witness while on the stand. I find nothing in the law indicating that prospective jurors cannot be judged in like manner.

Although capable of dual interpretation, I attach little significance to the prosecutor's side bar remark that it was his prerogative to be harder on Petty in his questioning than on other jurors. At no time during the questioning of Petty did Mitchell's counsel object to the manner in which the prosecutor was questioning Petty, and the remark by the prosecutor is at most indicative of his dissatisfaction with Petty's demeanor in responding to the prosecutor's other questions.

Even if I were convinced that Mitchell established a prima facie case of purposeful discrimination, I find that while the trial court can only barely be said to have conducted the "sensitive inquiry" discussed in *Ward*, the prosecutor's explanation for the challenge satisfied the State's burden that it "articulate a neutral explanation related to the particular case to be tried." I therefore respectfully dissent. Hays, J., joins in the dissent.