David Lee STARR *v.* STATE of Arkansas

CR 87-20                                    759 S.W.2d 535

Supreme Court of Arkansas
Opinion delivered November 7, 1988
[Rehearing denied December 12, 1988.]

*Etoch & Etoch* and *Sam Whitfield*, for appellant.

*Steve Clark*, Att'y Gen., by: *Jack Gillean*, Asst. Att'y Gen., for appellee.

DARRELL HICKMAN, Justice. David Lee Starr was sentenced

to death for the murder of Mrs. Gladys Ford of Marvell, Arkansas. Mrs. Ford, age 76, was killed at her home on June 11, 1984. Starr made three detailed statements, finally admitting that he killed Mrs. Ford. There was also other evidence connecting him to the crime.

The main question raised is whether Starr's arrest was legal and whether the exclusionary rule should be applied in this case. The trial court held that the police officers acted in good faith in arresting Starr. We agree and affirm the judgment, finding no other reversible error.

## THE FACTS

On June 9, 1984, the police in Marvell, Arkansas, which is in Phillips County, were contacted by Clarendon city officers in nearby Monroe County regarding Starr. He was wanted for questioning about a burglary and theft. The Marvell officers located Starr, brought him in for questioning, and asked him to empty his pockets, which he did. Starr saw an opportunity to flee and did. He was not under arrest. Warrants for his arrest for burglary and theft were issued that day in Monroe County.

On June 11 about 11 a.m., Mrs. Ford was brutally murdered outside her home. She was struck twice with a metal pipe, dragged inside her home and sexually assaulted. The house was ransacked. Her body was found by relatives shortly thereafter, and the police arrived on the scene about 1 p.m.

According to two officers, Starr became a suspect during the investigation conducted at Mrs. Ford's home. Kenneth Winfrey, chief deputy sheriff of Phillips County, responding to a call, went immediately to the scene. He said Starr became a suspect for three reasons: Starr was seen in a nearby field near a wooded area (the field was a quarter to a half mile away); many footprints were found in that area similar to those found outside Mrs. Ford's home; and he was informed that Starr had either done yardwork for Mrs. Ford or had gone to her home and asked about doing yardwork.

John Broome, a deputy sheriff from Phillips County, was also at the scene and said he learned the same information about Starr.

A full palm print was found in Mrs. Ford's home, footprints were found in the yard and blood and semen samples were taken.

The police began looking for Starr in Marvell and the surrounding area and on June 13, Starr narrowly avoided capture at his girlfriend's house. On June 14 the warrants from Monroe County for Starr's arrest for burglary and theft were received by the Marvell Police Department. The next day, June 15, about 1 a.m., Starr was arrested at his sister's home in Marvell. When the officers called for him to come out, he did. An officer entered the house and found a pistol behind a couch. It was later identified as being taken from the Ford residence.

Starr was taken to the Marvell jail, informed of his rights, and made a statement 23 minutes later. He was questioned largely about the pistol which he said he got from a man whose name he did not know. He denied knowing about the murder of Mrs. Ford. He was then taken to the city jail in Helena and again warned of his rights. That evening he said he wanted to add to his statement. He was taken to the scene of the crime and said that his girlfriend, Shirley Smith, actually hit Mrs. Ford. He showed the police where he pulled up an iron pipe which was used to kill Mrs. Ford. He later told them where the pipe was hidden under a dresser in the house. He said his girlfriend found the gun and he took it. He admitted he and his girlfriend intended to rob Mrs. Ford.

His third statement followed shortly thereafter. Again, he wanted to tell the police more. This time he confessed in detail to the murder. The last two statements were recorded, transcribed and entered at the trial. In his last statement, he admitted striking Mrs. Ford, raping her afterwards, ransacking the house looking for money, and finding the pistol which he stole.

The officers all agreed that Starr was initially arrested on the basis of the two warrants from Monroe County. Starr was not arrested for the murder until after he confessed. The palm print found in Mrs. Ford's home was later identified as Starr's and other evidence tied Starr to the murder.

## THE GOOD FAITH QUESTION

It was argued below that the arrest, based on the warrants from Monroe County, was illegal and, therefore, all

evidence produced as a result of the arrest must be excluded. That is the exclusionary rule. *Wong Sun* v. *United States*, 371 U.S. 471 (1963). However, the United States Supreme Court has modified the exclusionary rule if officers act in the reasonable good faith belief that a search or seizure was in accord with the Fourth Amendment. *United States* v. *Leon*, 468 U.S. 897 (1984). The court stated:

> In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. '[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law' . . . . Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations . . . . [T]he officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable . . . . [I]t is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

That ruling has been extended to include evidence obtained by police who act in objective reasonable reliance on a statute later found unconstitutional. *Ill.* v. *Krull*, ___ U.S. ___, 107 S. Ct. 1160 (1987). More recently an extension was made to cover the actual execution of a search warrant. *Maryland* v. *Garrison*, 480 U.S. 79 (1987).

In this case the question is: should the officers have known the Monroe County warrants were invalid because they were signed by a clerk instead of the judge? There is no evidence at all that the warrants were issued except in good faith. A pretrial motion was filed alleging no probable cause to arrest Starr "on murder." No hearing was held on this question, counsel merely argued and the judge overruled the pretrial motion to suppress. The state said it would produce evidence that he was arrested on warrants for burglary. Later, the warrants were presented, and after the testimony of the officers, the defense argued the arrests were invalid on the basis of *Stewart* v. *State*, 289 Ark. 272, 711 S.W.2d 787 (1986). In *Stewart* blank warrants were signed by

the judge and left with the clerk to issue. A policeman obtained such a warrant on the basis of an unsworn affidavit. We held the arrest invalid and found no evidence of any good faith. In this case the defense argued these Monroe County warrants were not signed by a judge, accompanied by an affidavit or information and, therefore, the arrest was invalid. The trial judge distinguished the *Stewart* case and ruled the officers in this case acted in good faith.

We have only the unrefuted testimony of the officers. It was not uncommon for the clerk to sign warrants. The warrants appeared regular to them on their face, and they acted in good faith in executing them. There was no evidence offered controverting the fact that Starr was wanted for the burglary and theft in Monroe County. That is, the argument was not that there was actually no probable cause, merely the warrants were invalid on their face and for that reason there was no probable cause. Our own rules of criminal procedure provide that "the clerk of the court or his deputy may, when authorized by the judge of that court, issue an arrest warrant upon filing of an information or upon affidavit sworn to by the complaint and approved by the prosecuting attorney." A.R.Cr.P. Rule 7.1(c). These officers did what any ordinary Arkansas policeman would have done at the time—they arrested Starr.

■ The trial occurred in October, 1986. In September, 1987, the United States District Court for Eastern Arkansas decided it is illegal for a clerk to issue an arrest warrant unless a probable cause determination has been made by a neutral and detached magistrate. *Fairchild* v. *Lockhart*, 675 F.Supp. 469 (E.D. Ark. 1987). We have accepted that decision as correct. *David* v. *State*, 293 Ark. 472, 739 S.W.2d 150 (1987). These officers could not anticipate, nor should they have to, that an accepted practice would be ruled illegal—that our own rules would be declared wrong. There was no dishonest or reckless behavior on the part of any of the officers in this case; there is no evidence refuting they acted in good faith in accepting these warrants which appeared routinely issued.

■ It is pointed out that A.R.Cr.P. Rule 7.2(a)(v) provides that an arrest warrant will have attached to it a copy of an information or an affidavit. It is also pointed out that *Leon* does

not apply to facially invalid warrants. That omission is not, in our judgment, fatal. We will not assume it is customary in Arkansas that every arrest warrant have attached the information or affidavit. It is not even necessary for an officer to have an arrest warrant in his hand to make an arrest. In *Woodall* v. *State*, 260 Ark. 786, 543 S.W.2d 957 (1976), two state policemen, acting on the basis of information from the law enforcement computer indicating an out-of-state warrant, arrested a defendant. The officers had no warrant. Probable cause is evaluated on the basis of the collective information of the police. *Jones* v. *State*, 246 Ark. 1057, 441 S.W.2d 458 (1969). *See also Logan* v. *State*, 264 Ark. 920, 576 S.W.2d 203 (1979).

■ It is argued that *State* v. *Anderson*, 286 Ark. 58, 688 S.W.2d 947 (1985), and *Webb* v. *State*, 269 Ark. 415, 601 S.W.2d 848 (1980), require reversal of the trial court's decision. In *State* v. *Anderson* the issue involved a search warrant issued without an accompanying sworn affidavit or sworn recorded testimony. We said "the procedure of providing an affidavit when obtaining a search warrant is so standard a practice that we cannot consider such a deficiency as falling within the purview of the good faith error." That requirement is in the United States Constitution. The ordinary officer knows better than to seek a search warrant without any affidavit, or he should. The same is, of course, not true of an arrest warrant unless the officer executing it obtained it in bad faith. As we have demonstrated, an officer does not even have to have the warrant in hand.

In *Webb* we found a warrant issued by a clerk defective but upheld the arrest on the basis of probable cause. The officer had probable cause because he relied upon information that an arrest warrant was outstanding. *Webb* did not declare the practice illegal of a clerk issuing a warrant. *See Fairchild* v. *Lockhart, supra*, in which the court discussed the meaning of *Webb*.

■ The only objection at the trial was because the clerk signed the warrants and there were no accompanying affidavits. The only authority argued to the trial judge was the *Stewart* decision which he distinguished. It is now argued that even if there was probable cause, the warrants were invalid on their face and the good faith exception should not apply. The trial judge thought he was ruling on the question raised in *Stewart* v. *State,*

*supra.* It was not until *Fairchild* v. *Lockhart, supra,* that the Arkansas legal community changed its practice. What we have is a decision by the trial court based on objections specifically made, testimony and evidence offered, and our review is limited to whether he was wrong. *Harris v. State,* 295 Ark. 456, 748 S.W.2d 666 (1988).

There is no evidence that the officers acted except in good faith and according to custom. No pretrial motion was filed making the argument now made on appeal. A narrow legal argument was made after the officers' testimony. There is no suggestion raised that this was a pretextual arrest.

In *Hines* v. *State,* 289 Ark. 50, 709 S.W.2d 65 (1980), we said:

> On appeal, all presumptions are favorable to the trial court's ruling on the legality of the arrest and the burden is on the appellant to demonstrate error. . . . [A] nontechnical approach has been said to afford the best compromise for accommodating the competing interests of the individual and of society . . . .

Other than the technical objection to the warrants, no evidence was offered to refute the officers' repeated testimony that Starr was warned of his rights and voluntarily confessed. So we conclude the confessions were properly admitted and the trial judge was not clearly wrong in upholding the arrest.

## REMAINING ARGUMENTS

The remaining arguments are also procedural. Two prospective jurors, Mrs. Janice Aikman and Mrs. Gynith Papa, admitted they had read a brief article in a local newspaper which mentioned the fact that Starr had a prior record and had spent time in the state prison. Mrs. Aikman and Mrs. Papa both said they could set aside any information they had gained and render a fair verdict. The judge refused to excuse them for cause. Our study of the record reflects that the trial judge was careful in his judgment and both prospective jurors were questioned extensively. They were excused peremptorily by the defense.

Jurors are presumed unbiased, and the trial judge has considerable discretion in seating them. *Fleming* v. *State,* 284

Ark. 307, 681 S.W.2d 390 (1984); *Linnell* v. *State*, 283 Ark. 162, 671 S.W.2d 741 (1984). We have recognized that it is not practical to expect jurors to live in a vacuum. *Davis* v. *State*, 251 Ark. 771, 475 S.W.2d 155 (1972). We find no error in the court's ruling.

■ The third argument is that the trial judge erred in failing to answer the jury's questions about the meaning of life without parole, the verdict forms and what a hung jury is. We have repeatedly held that the trial court should not attempt to explain matters concerning parole. *Pruett* v. *State*, 282 Ark. 304, 669 S.W.2d 186 (1984). The court was right in not further instructing the jury on what life without parole means. It is always best to stick to the standard instructions. If they are complete, the jury can decide what to do. We find no abuse of discretion in refusing to further instruct the jury.

The fourth argument is about pecuniary gain being an aggravating circumstance in the penalty phase of the trial. This argument has been answered in *Lowenfield* v. *Phelps*, ___ U.S. ___, 108 S. Ct. 546 (1988) and *O'Rourke* v. *State*, 295 Ark. 57, 746 S.W.2d 52 (1988).

■ The fifth argument is that the court should have appointed an independent psychiatrist or psychologist to assist with the preparation of the case. The defense argues it wanted to show that Starr could not intelligently waive his rights. There is no doubt that Starr is mildly retarded. He was examined at the local mental health clinic and given an extensive examination at the state hospital. The hospital findings were: (1) mild mental retardation; (2) mixed substance abuse—continuous; and (3) antisocial personality disorder. The report concluded that Starr could understand right from wrong. The defense did call Dr. Michael Simon, a clinical psychologist at the state hospital. He testified that Starr could not read. One of the officers had testified that Starr, one time, read his rights himself. The psychologist testified that Starr was retarded and had an I.Q. of 62. The defense does not contend that the mental examination of Starr did not fulfill the requirements of *Ake* v. *Oklahoma*, 470 U.S. 68 (1985). It contends more was required in this particular case. State officials who examined Starr would have been available to answer any questions Starr had in that regard. The answers

sought by Starr were simply not there. He could understand his rights even though he is mildly retarded. *See White* v. *State*, 290 Ark. 130, 717 S.W.2d 784 (1986). His confessions reinforce this conclusion. Starr's answers were clear, distinct and coherent. He signed his name and the officers testified it was clear that he knew what he was doing. There is no suggestion any coercion was used, direct or indirect.

The sixth argument is that the trial judge should have instructed the jury it was not required to impose the death penalty. AMCI 1509 was the instruction given, and a jury can, by finding that circumstances do not warrant the imposition of the death penalty, return a verdict of life without parole. *Clines* v. *State*, 280 Ark. 77, 656 S.W.2d 684 (1983).

The seventh argument is that the gun should have been suppressed. No pretrial motion was filed, simply an objection made when the gun was admitted into evidence. It was found in Starr's sister's home—not Starr's home. Based on the evidence before the trial judge, he was justified in finding that Starr had no standing to object to the warrantless search of his sister's home. *Rakas* v. *Illinois*, 439 U.S. 128 (1979); *State* v. *Hamzy*, 288 Ark. 561, 709 S.W.2d 397 (1986).

We are required in a death case to compare the crime with those of others receiving the death sentence. The brutal, senseless bludgeoning of Mrs. Ford and the subsequent violation of her body was especially offensive, inhuman and cruel, and unquestionably warranted the death penalty. The evidence of Starr's guilt is overwhelming.

We have examined the record for other errors which would require a new trial and find none.

Affirmed.

PURTLE, DUDLEY, and NEWBERN, JJ., dissent.

DAVID NEWBERN, Justice, dissenting.

The right of the people to be secure in their *persons*, houses, papers, and effects, against unreasonable searches and *seizures*, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be

searched, and the *person* or things *to be seized.*

These, with certain of them emphasized, are the words of the Fourth Amendment to the United States Constitution.

The words of Ark. R. Crim. P. 7.2. follow:

Rule 7.2. Form of Warrant.

(a) Every arrest warrant shall:

. . .

    (iii)   be signed by the issuing official with the title of his office and

. . .

    (v)   have attached a copy of the information, if filed, or, if not filed, a copy of any affidavit supporting issuance

. . . .

In *State* v. *Anderson*, 286 Ark. 58, 688 S.W.2d 947 (1985), we refused to consider the "good faith rule" of *United States* v. *Leon*, 468 U.S. 897 (1984), as legitimating a search based on a warrant with no supporting affidavit, and we wrote: "The procedure of providing an affidavit when obtaining search warrants is so standard a practice that we cannot consider such a deficiency as falling within the purview of good faith error." The Monroe County warrants which the state says formed the basis for Starr's arrest in Phillips County were equally deficient. Officer Nolan of Monroe County testified he did not see any affidavit with the warrants for David Starr's arrest. Rule 7.2(a)(v) requires that either an information or an affidavit be attached to an arrest warrant. The burglary and theft warrants were signed by Tammy Ellis who, Officer Nolan testified, was a court clerk. Under her signature, were the following words printed on the warrant form, "Municipal Judge, Clarendon, Monroe County, Arkansas." The word "Judge" under her name was crossed out, and nothing was put in its place. Rule 7.2(a)(ii) requires a signature by the issuing official with the title of his office.

To justify its application of the *Leon* case doctrine here, and thus avoid the exclusionary rule, the majority opinion makes two

points. First, it says that the affidavit in support of a search warrant, which was the element lacking in the *Anderson* case, is required by the Constitution. Clearly, there is, in the Fourth Amendment, the same requirement for an arrest warrant, and that requirement is reflected in our rules. I suggest the requirement for supporting documentation is just as "standard" in arrest warrant cases as in search warrant cases. Second, the majority opinion says that a police officer need not have an arrest warrant in hand when the arrest occurs. That is true, Ark. R. Crim. P. 4.3., but it does not justify an arrest where there is no supporting document attached to the warrant pursuant to which the arrest was made, and the state cannot even produce testimony after the fact that such a document existed. Nor does it justify the admission of evidence which results from such an arrest where the state cannot show compliance with the rules of criminal procedure.

The requirement of Rule 7.2. that the warrant have the supporting documentation attached to it makes sense. Otherwise, by "community custom" a practice could develop which would permit an arrest on the basis of a piece of paper with no support whatever. The arresting officer could say, as here, that he made the arrest assuming the warrant was good, and thus he or she acted in good faith.

Just as we did not get to it in the *Anderson* case, I do not find it necessary even to consider application of the *Leon* case doctrine here. However, if that were the issue, it would not seem to me to be too much to require an officer to examine or at least to inquire about an arrest warrant to learn whether it is signed by someone purporting to be an authorized official and is accompanied by a supporting document or documents before we hold that the officer has acted in good faith in executing the warrant. In its zeal to expand upon the *Leon* case, the majority applies it in a way not demonstrably intended by its authors, and in the process the Fourth Amendment requirement that there be more than a piece of paper styled "arrest warrant" is subverted.

I respectfully dissent.

Purtle and Dudley, JJ., join this opinion.